**R & R CONTRACTORS and R & R OILFIELD SERVICES, INC., Appellant,**

v.

**Mary TORRES, Individually and on Behalf of the Estate of Gregorio Torres, Jr., Abel Torres, Robert Torres and Beatrice Torres, Appellees.**

**No. 13–00–342–CV.**

Court of Appeals of Texas, Corpus Christi–Edinburg.

June 27, 2002.

Lamont A. Jefferson, Davis, Adami & Cedillo, Nissa M. Sanders, Crofts, Callaway & Jefferson, San Antonio, for Appellant.

Jacob G. Munoz, Kevin W. Grillo, Hilliard & Munoz, Corpus Christi, for Appellees.

Before Justices HINOJOSA, YAÑEZ, and CASTILLO.

1. According to trial testimony, appellants R & R Oilfield Services and R & R Contractors are the same company.

2. The parties do not dispute that the event made the basis of the underlying lawsuit occurred during and in the course of employment.

## OPINION

CASTILLO, Justice.

Appellants, R & R Contractors and R & R Oilfield Services, Inc. (hereinafter appellant or "R & R")[1] employed Gregorio Torres, Jr., a truck driver, who, during working hours near quitting time, died after a thousand-pound tank slipped from a sling and crushed his lower body.[2] Appellees, his widow, Mary Torres, and his children, filed a gross negligence action under the Texas Workers' Compensation Act for wrongful death.[3] TEX. LAB. CODE ANN. § 408.001 (Vernon 1996). The case was tried solely on the issue of exemplary damages. A jury found R & R grossly negligent and awarded $200,000.00 in punitive damages. The trial court rendered judgment on the jury's verdict. R & R raises two issues on appeal: (1) whether the evidence was legally sufficient to support the jury's finding of gross negligence, and (2) whether the trial court improperly refused to require the plaintiffs below to prove gross negligence by clear and convincing evidence. We reverse and remand the judgment of the trial court.

## FACTUAL BACKGROUND

R & R has raised the issue of legal sufficiency of the evidence. In considering legal sufficiency points, a reviewing court must consider all of the record evidence in the light most favorable to the party in whose favor the jury entered a verdict and indulge every reasonable inference deducible from that evidence in favor of that party. *Hines v. Comm'n for Lawyer Discipline*, 28 S.W.3d 697, 701 (Tex.App.—

3. Appellee Mrs. Torres sued individually and on behalf of the estate. Her adult children Abel, Robert, and Beatrice Torres were also plaintiffs below.

Corpus Christi 2000, no pet.)(citing *Formosa Plastics v. Presidio Eng'rs*, 960 S.W.2d 41, 48 (Tex.1998)). Accordingly, the record before us reflects the following.[4]

On October 3, 1995, Torres was a truck driver for R & R, having been employed with the company for four years. He was licensed to transport hazardous materials and his job entailed delivering fuel tanks or pipe and similar materials to work sites. At trial, R & R's construction foreman, Thomas Sliney, testified that on the day of the incident, he had used the cherry picker to move a small building to another part of the yard.[5] At about 3:20 p.m., near quitting time, he was parking the cherry picker when Torres, who was standing next to the tank atop the trailer, signaled him to unload the tank from the trailer and signaled where he wanted the tank placed. The intent was to unload the tank and set it on top of concrete curb stops, its usual location, over fifty feet away. Sliney drove the cherry picker toward the rear of the trailer upon which Torres had now climbed.

Sliney saw that Torres had secured a chain from the tank onto the lifting hook on the cherry picker, but he did not see how the chain was secured around the tank itself. He could not see both sides of the tank and so could not see exactly how the chain was hooked. Using the cherry picker, Sliney lifted up the tank and began reversing the cherry picker as Torres got off the trailer. Once off the trailer, Torres proceeded to help guide the tank by holding on to a rail, also called a skid, at its bottom. As Sliney reversed and the tank cleared the trailer, the end of the tank opposite him tilted downward, and, since Torres was still holding onto the bottom of the tank at the other end, its weight lifted him up approximately one foot off the ground. Either letting go or losing his grip, Torres fell to the ground flat on his back. At about the same time, the chain securing the tank released and the tank fell on Torres's lower body. At the time the tank was lifted from him, Torres was alive. Later that day, he died as a result of his injuries.

Sliney did not check the tank before lifting it, and so he did not know whether it contained fuel and did not know its weight. He did not know whether the tilting of the tank happened because of fuel shifting inside it or whether Torres pushed too hard when holding on to it. He denied that it was important for a crane operator to check the load before lifting it and explained, "As a crane operator, you can't get out and check everything that happened. You have to depend on the people, the experience of the people that are rigging for you to secure the load." Stating that operating safety equipment involved some degree of risk, he admitted he was "not experienced in the rigging of this particular tank," had not moved this kind of tank previously, and that "very rarely" is a lift done "all by yourself." Adding that the chain Torres used "could be a proper chain" "if it had been rigged differently," he testified, "[t]hat chain was capable of lifting that tank." Offering other ways the load could have been secured, he explained that, although he thought Torres's method was correct, he would have "rigged it differently" by using "either lifting lugs" or "a different type of lifting device," which would have been safer. He suggested that Torres could have

---

4. Witness testimony is provided chronologically.

5. Sliney had been employed with R & R since February 1995. He explained that "Miguel and some of the people that were working with him" helped him with the move. They "had it rigged up and ready when I got there."

hooked the chain "into the lifting eyes. He could have wrapped it around the leg coming off the skid, wrapped it and hooked it." When asked if the chain was long enough to have put it into the lifting eyes, he responded that he did not know if the chain was long enough but believed it was.

Sliney also explained that a tag line is a rope "used to tie onto something when you're moving it with a crane to guide it, control it when you're lifting it up in the air, or if it's a very large object." [6] He testified that in this case a tag line was "not necessary," offering that the safer procedure would have been for Torres to guide the load with his hand. When asked again whether the load was secured correctly, he responded, "It was my assumption that it was correct, just due to the fact that he had just loaded this tank and he had moved this tank before, and he, I assume, that he rigged it the same way." [7] But, he "personally probably would have rigged it differently." He "personally probably would have wanted it more secure. I may have—should have used either lifting lugs or used a different type of lifting device."

Regarding the company's safety manual, Sliney said it contained the responsibilities and duties for job safety for foremen and supervisors. He acknowledged that the goal for on-the-job safety was for an employee to stay away from a suspended load and the load at issue was a suspended load. In his opinion, the ultimate responsibility for making sure the proper lifting equipment was used was that of Torres, explaining, "He was the truck driver. He was in charge of that truck, in charge of loading it and unloading it." Also, in his

opinion, the responsibility for making sure the load was properly secured was that of Torres. In his opinion, Torres was a qualified cherry picker operator. When asked who held the responsibility of clearing the area of the lift, Sliney answered, "Well, it's the people working their's [sic] responsibility. If someone is there that doesn't know any better, you will tell them, 'Move, get out of the way.' But when someone has experience at it, they know what to do." He believed it "normally would be a safe enough distance" between Torres and the tank, with Torres having his hand on it, "for a small move like that."

When asked if the way the move was executed "is acceptable, and that's not a safety violation of any of the safety rules," Sliney responded, "No," based upon training and experience in the years he had working with equipment. He added, "There should have been no danger in this situation" and believed the incident occurred because of Torres. He denied he had any responsibility to ensure Torres made the right decisions. He admitted having "somewhat responsibility" that the chain had the strength to lift the tank. He admitted he had the responsibility to stop the lift if he determined the equipment was wrong or was being used improperly. He added that, if anyone around "had seen something wrong, noticeably wrong, they could have stopped it," including himself.

Sliney further testified he was "somewhat familiar" with safety rules and regulations regarding the operation of heavy equipment and about particular chains and slings to use. He acknowledged that the rules were to "prevent accidents." Sliney

---

6. He explained that the tag line keeps the load "under control. If it starts to move, you can stop it."

7. After the incident, Sliney learned that Torres had transported the fuel tank from a job site in Smiley, and that the tank had been loaded onto the trailer with a backhoe: "It was just drug up on the top of the truck. It was not lifted."

admitted following safety rules was important and that the more safety rules were violated, the greater the risk of injury. When asked if he knew a safety policy for R & R that referred to removing people from the lift area, he responded that he did not know. He said that the company president, Richard Custer, had hired him to perform supervisory jobs as a crane operator and as a construction foreman. R & R did not test him to determine the level of skill and qualifications he had to operate cranes.

Employed with the company since 1992, Timothy Pritchard, the safety manager, testified that he conducted safety meetings on a weekly basis unless, in his absence, he designated the office manager or supervisors to conduct them. The meetings lasted anywhere from ten to thirty minutes and, while the employees remained standing, they were allowed to eat their breakfast during the meetings. He explained that a rigging manual comprehensively details "every possible aspect ... about crane capacities, anything that has to do with rigging up a load to be lifted and moved," although, at the time of the incident, he did not believe he "even knew what it was." He did not believe Torres to be qualified to operate a cherry picker.

Because the company president hired equipment operators, Pritchard would "assume" an employee had the right to operate the equipment, unless he saw "something obviously dangerous." Other than employee feedback regarding operation in an unsafe manner, he had no procedure to determine or monitor an employee's skill and experience level with regard to the operation of heavy equipment such as a cherry picker.

When asked who was responsible for making sure the slings were properly attached, Pritchard answered, "[t]he ultimate responsibility falls on the cherry picker operator." The responsibility for making sure that people were clear of a load "would also fall with the cherry picker operator." If the crane operator saw that the chain slings around the load were not secured properly, he had the responsibility to stop the lift. In Pritchard's opinion, the chain used to unload the tank in this case was not the correct one to use, the manner in which it was used to secure the tank was also not correct, and both were violations of company safety rules and federal government rules.[8] That Torres remained near the lift was also violative of safety standards, all known to a qualified crane operator. In his opinion, Sliney violated known safety standards.

Upon questioning by R & R's counsel, Pritchard also testified about subjects covered in safety meetings during 1995. He testified regarding the subject he discussed with attendees during the June 21, 1995 safety meeting, which both Torres and Sliney attended, regarding crushing accidents. He advised employees that "crush accidents have occurred because of being in a hurry or not letting others know ... what we are going to do so that they can allow forgetting [sic] in the way." From Pritchard, the jury heard about an accident in which one employee attempted to move a rig while another employee was beneath it in front of the rear wheels. The jury also heard that the leading type of accident up to June of that year for R & R

---

**8.** He testified, "That chain should not have been used.... If you're going to use a chain sling to lift an object, you need what's called a two-legged chain sling where you have two sections of chain that go to a central loop. The central loop would be placed over the hook and that way would keep it from sliding like it can there through the hook." He also testified that a "wire rope sling would have been a more adequate method to rig up that tank for safe movement ...."

was "crushing incidents," including an employee who "crushed his thumb in a lathe, another crushed his finger in a gate, another crushed his leg between two pieces of pipe." Pritchard instructed the employees to always keep a safe distance from equipment to avoid being crushed from mechanical failure or operator error. He further instructed employees to never "get under any suspended load or equipment part."

According to Pritchard, although a tag line was not used in unloading the tank, it would have been a safe procedure.[9] He never trained or provided to Torres information regarding how to properly rig heavy equipment. He acknowledged that a qualified operator would immediately have recognized the load was improperly secured and that part of a supervisor's responsibility was to enforce safety rules and ensure proper equipment was used. The jury viewed, while Pritchard explained, a video tape showing the proper method of unloading the tank, including the use of a wire rope sling to drag, not lift, the tank off the trailer and a tag line "allowing partial control of the load" without the "helper getting too close to the load." After Torres's death, Sliney told Pritchard that, prior to the incident, he had considered the manner in which Torres secured the tank "strange."

Jack Larks, a forensic engineer and independent consultant in job and workplace safety, was the expert testifying for the Torres family. His field of expertise centered on "any job and workplace safety requirements." In his opinion, the particular chain should not have been used, Torres should not have been near the load, and the ultimate responsibility for ensuring that the lift was made safely and properly was that of the crane operator. He added that, while Torres was anywhere within ten feet of the suspended load, which is the danger zone, the crane operator should have immediately stopped the lift and made sure Torres got out of the way. When asked if the manner in which the equipment was used created an "extreme degree of risk considering the probability and magnitude of potential harm to employees," he replied, "Definitely." When asked if "for any crane operator to proceed with the lift under the circumstances in this case amounts to conscious indifference to the rights, the safety and welfare of Mr. Torres," he responded, "Yes." He added that "this was an unsafe lift. This constituted an imminent danger to people in the vicinity of that load." He concluded that "this constituted gross negligence, because the standards and regulations were violated. Even an experienced operator should know you don't lift when anybody is close to the suspended load."

He added that OSHA law requires an employer to furnish safe equipment and a safe place of employment. Regarding heavy equipment, Larks testified that OSHA mandates that an employer "permit only those employees qualified by training or experience to operate equipment and machinery" and that the employer "instruct each employee in the recognition and avoidance of unsafe conditions." In his opinion, a qualified crane operator:

> is one who has demonstrated his ability to operate a crane, and then, also, operate it safely with regard to knowledge of rigging practices, whether a load has been properly and safely rigged, and that the operator demonstrates, through performance and written tests, that he has the requisite knowledge and skill to recognize safe or unsafe operations since a crane operator is responsible for the lift.

---

**9.** Sliney had previously testified a tag line

would *not* have been appropriate.

He added that cranes "have one thing in common, they become dangerous if the operator is not educated, qualified and trained." He explained that a rigger is "an individual who's qualified by training, education, experience, and supervision to attach equipment or devices to loads so that they may be safely lifted with regard to weight mass distribution and control." Truck drivers, such as Torres, are "qualified at driving the vehicle and seeing that the load is secured on the truck" but are "not responsible for rigging and seeing that the load is lifted or lowered safely." Important in unloading, hand signals between a rigger and crane operator are listed in the regulations.

The president of the company, Richard C. Custer, Jr., testified he had experience operating a "15 ton crane cherry picker" and considered himself a qualified operator, but did not feel comfortable enough to train someone to operate a crane. He hired Sliney to "operate the equipment" and to run jobs as a supervisor.

After the incident, Sliney told him he had doubts about the way the tank was hooked and the chain used, but did not question it because Torres knew what he was doing. Sliney explained to him that after backing up the crane, he stopped in order to lower the tank, at which time the tank "started tilting." As reported, as Torres reached up, the tank flipped and Torres fell, with the tank then falling on him. Custer explained that Torres was reportedly "on the end of the tank closest to the cherry picker" about twelve or fourteen feet in front of the crane. Custer would not have allowed Torres to remain near the load while the lift was being done, he would not have used the chain used, he would not have secured the load in the manner secured, he would not have done the lift knowing the way it was secured

because it created a risky and dangerous situation, and any qualified operator would have known that. He acknowledged that Sliney should have immediately recognized that the chain was improper for the lift, since the chain was one used to tie down equipment on the trailer. He admitted that Sliney had the ultimate authority to decide whether to do the lift. He testified, "Tom Sliney's a competent crane operator, but he made a mistake . . . a serious mistake." Explaining why he considered Sliney a competent crane operator, Custer stated, "Up to this time he'd been working in the yard, we never had no incidents with him. Since that time, his employment with R & R, there has never been any other incidents, and he's been an excellent employee."

The jury also heard the testimony by deposition of Richard Paul Whitney, Sr., who had been an eighteen-year employee of R & R. As a construction superintendent, his opinion was that Sliney should not have continued the lift until Torres "got out of the way" because "it's putting him in danger."

The last witness for the plaintiffs below was Mary Torres, who testified she had been married to Torres for thirty-two years. Abel, Beatrice and Robert were born of the marriage.[10] She testified that Torres died at about 6:30 p.m. on October 3, 1995.

For R & R, Monty Keller testified that he had worked with R & R since 1992 and was an assistant mechanic foreman at the time of the incident. He recalled Torres parked the tractor-trailer he was driving in front of the shop at about 3:20 p.m., ten minutes before quitting time. Torres signaled him to approach and asked if he

**10.** At the time of trial, Abel was 34, Beatrice was 32, and Robert was 24.

wanted the diesel tank in its usual place.[11] Keller responded that he wanted it moved somewhere else because of traffic congestion in the area and recommended Torres wait until morning so that he would "have a lot of help" unloading it. Although he attended safety meetings, Keller had not read the company safety manual for over two years. As a supervisor, he had the responsibility to train his employees regarding safety procedures and had the authority to hire his employees with the consent of Custer, the company president.

## THE STANDARD OF PROOF

██ We begin by considering R & R's second issue, in which it maintains that the trial court improperly refused to require appellees to prove gross negligence by clear and convincing evidence. Appellant complains of the trial court's refusal to submit the gross negligence question under a "clear and convincing evidence" standard and, instead, submitting a charge to the jury which contained the gross negligence question under a "preponderance of the evidence" standard.[12] Appellant argues that, for all causes of action seeking exemplary damages which accrued after September 1, 1995, the "clear and convincing" standard applies under the mandate of civil practice and remedies code section 41.002(b). TEX. CIV. PRAC. & REM. CODE ANN. § 41.002(b) (Vernon Supp. 2002). Appellees counter that Chapter 41 did not apply to their cause of action when it accrued on October 3, 1995, and thus the

trial court correctly submitted the gross negligence question to the jury under the preponderance of the evidence standard.

### Preservation of Error

██ To preserve error for appellate review regarding a jury instruction, counsel must make an objection specific enough to enable the trial court to understand the precise grounds and make an informed ruling. TEX. R. APP. P. 33.1(a); *Castleberry v. Branscum,* 721 S.W.2d 270, 276 (Tex.1986). The test for determining if a party has preserved error in the jury charge is whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling. *State Dep't of Highways & Pub. Transp. v. Payne,* 838 S.W.2d 235, 241 (Tex.1992). Where the complaint is that the trial court failed to submit a particular definition or instruction, the complaining party must have presented a written request for its inclusion, tendering the proposed definition or instruction in substantially correct wording. TEX. R. CIV. P. 278; *Gilgon, Inc. v. Hart,* 893 S.W.2d 562, 565 (Tex.App.-Corpus Christi 1994, writ denied). However, if the charge contains an affirmative misstatement of the law, an objection suffices to preserve error. *Religious of the Sacred Heart v. City of Houston,* 836 S.W.2d 606, 613–14 (Tex.1992).

The question of the appropriate standard of proof was raised by appellant in its third amended answer,[13] filed January 29, 2000, in which appellant asserted that

---

11. Aside from supervising repairs of equipment, Keller was responsible for ordering the tank's fuel. Keller knew where he wanted the tank relocated but needed authorization for the move.

12. Clear and convincing evidence is that measure or degree of proof that will produce in the mind of the factfinder a firm belief or conviction about the truth of the allegations a party seeks to show. *State v. Addington,* 588

S.W.2d 569, 570 (Tex.1979). Preponderance of the evidence means the greater weight and degree of credible evidence. *Upjohn Co. v. Freeman,* 847 S.W.2d 589, 591 (Tex.App.-Dallas 1992, no writ).

13. No other answers appear in the record so we do not know when this question was first raised.

chapter 41 of the Texas Civil Practice and Remedies Code was applicable to the instant action and prayed for the protections thereof, including the utilization of the "clear and convincing" standard of proof. On February 16, 2000, appellees filed a motion seeking the trial court's determination of applicable law and appellant filed a trial brief in support of the applicability of chapter 41, again advocating the application of the "clear and convincing standard." A hearing was held on the same and the trial court took the matter under advisement. On February 22, 2000, the trial court entered an order finding that chapter 41 did not apply to the plaintiffs' causes of action.

During the charge conference on February 25, 2000, appellant again requested that the court apply the procedural standards of chapter 41 and tendered proposed charges and instructions complying with chapter 41, which included the clear and convincing standard of proof.[14] Appellant also made a formal objection to the trial court's failure to apply chapter 41 of the Texas Civil Practice and Remedies Code in submitted questions and instructions to the jury, noting that this failure rendered the court's charge erroneous in several respects, including the standard of proof for finding exemplary damages, which under the applicable law, was required to be clear and convincing evidence. We find that appellant's actions amply preserved this question for our review.

## Standard of Review

■■■ The standard of review for error in the jury charge is abuse of discretion, which occurs only when the trial court acts without reference to any guiding principles. *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex.2000); *Fluor Daniel, Inc. v. Boyd,* 941 S.W.2d 292, 295 (Tex.App.-Corpus Christi 1996, writ denied). The trial court has considerable discretion to determine necessary and proper jury instructions. *In re V.L.K.*, 24 S.W.3d at 341. When the trial court refuses to submit a requested instruction, the question on appeal is whether the requested instruction was reasonably necessary to enable the jury to render a proper verdict. *Texas Workers' Comp. Ins. Fund v. Mandlbauer,* 34 S.W.3d 909, 912 (Tex.2000); *see* TEX. R. CIV. P. 277. An incorrect jury instruction is only grounds for reversal if it probably caused the rendition of an improper judgment. TEX. R. APP. P. 61.1(a); *Louisiana–Pacific Corp. v. Knighten,* 976 S.W.2d 674, 675–76 (Tex.1998). Submission of a lesser standard of proof is reversible error. *In the Interest of H.,* 630 S.W.2d 441, 446 (Tex.App.-Corpus Christi 1982, writ dism'd w.o.j.); *see also Upjohn Co. v. Freeman,* 847 S.W.2d 589, 592 (Tex.App.-Dallas 1992, no writ)(application of incorrect standard of proof was abuse of discretion).

## Statutory History

The Texas Legislature has mandated that a claim for exemplary damages sur-

**14.** According to the reporter's record, appellant tendered requested jury charge questions one and two and requested jury instructions one, two, three, six and seven. Requested jury question one, which appellant claimed submitted the question of damages in a manner compatible with chapter 41 did not appear in the clerk's record. Requested jury question two, which asked the jury whether it found by clear and convincing evidence that the harm to Torres resulted from malice and all of the requested instructions, including jury instruction one, which sets out the definition of clear and convincing evidence, appear in the record. Appellant's statement of matters to be included in the supplemental clerk's record (which itself appears in the record) requested that all of its requested jury questions and instructions be included. Pursuant to our authority under Texas Rule of Appellate Procedure 34.5(c), we requested, and received, the missing instruction.

vives in the case of a workers' compensation wrongful death claim. TEX. LAB. CODE ANN. § 408.001 (Vernon 1996). This statute implements the constitutional protection provided by the Texas Constitution in section 26 of article XVI which reads:

> Every person, corporation, or company, that may commit a homicide, through willful act, or omission, or gross neglect, shall be responsible, in exemplary damages, to the surviving husband, widow, heirs of his or her body, or such of them as there may be, without regard to any criminal proceeding that may or may not be had in relation to the homicide.

TEX. CONST. art. XVI, § 26.

Texas Labor Code section 408.001 gives effect to the constitutional provision in the context of an employee killed by his employer's acts, omissions or gross negligence, providing as follows:

> (a) Recovery of workers' compensation benefits is the exclusive remedy of an employee covered by workers' compensation insurance coverage or a legal beneficiary against the employer or an agent or employee of the employer for the death of or a work-related injury sustained by an employee.
>
> (b) This section does not prohibit the recovery of exemplary damages by the surviving spouse or heirs of the body of a deceased employee whose death was caused by an intentional act or omission of the employer or by the employer's gross negligence.
>
> (c) In this section, "gross negligence" has the meaning assigned by Section 41.001, Civil Practice and Remedies Code.

TEX. LAB. CODE ANN. § 408.001 (Vernon 1996).

Chapter 41 of the Texas Civil Practice and Remedies Code places limitations on, and standards for, the recovery of exemplary damages in Texas. TEX. CIV. PRAC. & REM. CODE ANN. §§ 41.001–.013 (Vernon 1997 and Supp.2002). It applies to any action in which a person seeks exemplary damages related to a cause of action, except for those brought under the Texas Free Enterprise and Antitrust Act of 1983, the Deceptive Trade Practices–Consumer Protection Act,[15] and actions brought under chapter 21 of the Insurance Code. TEX. CIV. PRAC. & REM. CODE ANN. § 41.002 (Vernon Supp.2002).

Prior to 1995, section 41.002 of the civil practice and remedies code contained a specific exception excluding the application of chapter 41 for actions brought by an employee's beneficiaries to recover exemplary damages against an employer for the death of an employee arising out of the course and scope of his employment, where an employer was a subscriber under the worker's compensation laws of the state. This was part of a "laundry list" of fifteen exceptions to the application of chapter 41.[16] Act of June 3, 1987, 70th

---

15. Except as specifically provided by section 17.50 of that Act. TEX. CIV. PRAC. & REM. CODE ANN. § 41.002 (Vernon Supp.2002).

16. Texas Civil Practice and Remedies Code section 41.002 then read:

> (a) This chapter applies to an action in which a claimant seeks exemplary damages related to a cause of action as defined by Section 33.001.
>
> (b) This chapter does not apply to:

> (1) an action brought under the Deceptive Trade Practices Consumer Protection Act (Subchapter E, Chapter 17, Business and Commerce Code) except as specifically provided in Section 17.50 of that Act;
>
> (2) an action brought under Chapter 21, Insurance Code;
>
> (3) an action brought under the workers' compensation laws of this state (Article 8306 et. seq., Revised Statutes);

Leg., 1st C.S., ch. 2, § 2.12, 1987 Tex. Gen. Laws 37, 44, *as amended by* Act of May 22, 1989, 71st Leg., R.S., ch. 380, § 5, 1989 Tex. Gen. Laws 1490, 1492 and Act of May 27, 1989, 71st Leg., R.S., ch. 1129, § 16, 1989 Tex. Gen. Laws 4643, 4652 (subsequently amended in 1995 & 1997) (current version at TEX. CIV. PRAC. & REM. CODE ANN. § 41.002 (Vernon Supp. 2002)). The specified actions were thus not subject to the limitations of chapter 41, including the then-existing requirement of a showing of fraud, malice, or gross negli-

gence,[17] the bar on prejudgment interest, and the cap that limited an award of exemplary damages to four times the amount of actual damages or $200,000, whichever was greater.

In 1995, the Texas Legislature passed significant and far-reaching tort reform legislation, including Senate Bill 25, which, among other things, amended chapter 41 to mandate a clear and convincing standard of proof in actions seeking exemplary damages,[18] set more stringent caps, and

(4) an action to recover exemplary damages against an employer by the employee's beneficiaries in a death action arising out of the course and scope of employment where the employer is a subscriber under the workers' compensation laws of this state (Article 8306 et. seq., Revised Statutes);
(5) an action brought under Chapter 246, Acts of the 63rd Legislature, Regular Session, 1973, Home Solicitation Transaction (Article 5069–13.01 et seq., Vernon's Texas Civil Statutes);
(6) an action brought under Chapter 547, Acts of the 63rd Legislature, Regular Session, 1973, Debt Collection Practices (Article 5069–11.01 et. seq., Vernon's Texas Civil Statutes);
(7) an action brought under Chapter 54, 91, or 92, Property Code;
(8) an action brought under the Texas Manufactured Housing Standards Act (Article 5221f, Vernon's Texas Civil Statutes);
(9) an action brought under the Texas Motor Vehicle Commission Code (Article 4413(36), Vernon's Texas Civil Statutes);
(10) an action brought under the Texas Proprietary School Act, Chapter 32, Education Code;
(11) an action brought under Section 9.507 or Section 27.01, Business & Commerce Code;
(12) an action brought under Chapter 36, Family Code;
(13) an action brought under the Health Spa Act (Article 5221, Vernon's Texas Civil Statutes);
(14) an action brought under the Business Opportunity Act (Article 5069–16.01 et. seq.), Vernon's Texas Civil Statutes; or

(15) an action brought under the Texas Timeshare Act.
(c) In an action to which this chapter applies, the provisions of this chapter prevail over all other law to the extent of any conflict.
Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.12, 1987 Tex. Gen. Laws 37, 44, *as amended by* Act of May 22, 1989, 71st Leg., R.S., ch. 380, § 5, 1989 Tex. Gen. Laws 1490, 1492 and Act of May 27, 1989, 71st Leg., R.S., ch. 1129, § 16, 1989 Tex. Gen. Laws 4643, 4652 (subsequently amended in 1995 & 1997)(current version at TEX. CIV. PRAC. & REM. CODE ANN. § 41.002 (Vernon Supp. 2002))

**17.** However, labor code section 408.001 imposed its own requirement of gross negligence. TEX. LAB. CODE ANN. § 408.001 (Vernon 1996).

**18.** The change of standard of proof was made in a revision of section 41.003 of the civil practice and remedies code. Prior to the 1995 amendments of Senate Bill 25, section 41.003 read:

(a) Exemplary damages may be awarded only if the claimant proves that the personal injury, property damage, death, or other harm with respect to which the claimant seeks recovery of exemplary damages results from:
　(1) fraud;
　(2) malice;
　(3) gross negligence.
(b) The claimant must prove the elements of Subsection (a)(1), (a)(2), or (a)(3). This burden of proof may not be shifted to the defendant or satisfied by evidence of ordinary negligence.

eliminated the "laundry list" of exceptions, providing instead for exceptions in only three of the original fifteen listed types of causes of action.[19] Act of April 11, 1995, 74th Leg., R.S., ch. 19, § 1, 1995 Tex. Gen. Laws 108, 109 (also at TEX. CIV. PRAC. & REM. CODE ANN. § 41.002(Vernon Supp.2002)). The exception for actions brought for exemplary damages for wrongful death actions under workers' compensation provisions was among those eliminated. The final vote passing this bill occurred on April 11, 1995. It had an effective date of September 1, 1995 and it applied to all causes of action which accrued after its effective date. Act of April 11, 1995, 74th Leg., R.S., ch. 19, § 1, 1995 Tex. Gen. Laws, 108, 109 (also at TEX. CIV. PRAC. & REM. CODE ANN. § 41.002 (Vernon Supp.2002)).

On May 27, 1995, the final vote on Senate Bill 1, the education reform bill, was taken. Buried in a bill of over a thousand pages overhauling the educational system of Texas was a two-page amendment to section 41.002(b) which was entitled "conforming amendment" and substituted proper code names and sections for outdat-

---

Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.12, 1987 Tex. Gen. Laws 37, 44 (amended 1995)(current version at TEX. CIV. PRAC. & REM. CODE ANN. § 41.003 (Vernon 1997)).
After the amendments made in 1995 by Senate Bill 25, section 41.003 reads:
(a) Except as provided by Subsection (c), exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from:
(1) fraud;
(2) malice; or
(3) willful act or omission or gross neglect in wrongful death actions brought by or on behalf of a surviving spouse or heirs of the decedent's body, under a statute enacted pursuant to Section 26, Article XVI, Texas Constitution. In such cases, the definition of "gross neglect" in the instruction submitted to the jury shall be the definition stated in Section 41.001(7)(B).
(b) The claimant must prove by clear and convincing evidence the elements of exemplary damages as provided by this section. This burden of proof may not be shifted to the defendant or satisfied by evidence of ordinary negligence, bad faith, or a deceptive trade practice.
(c) If the claimant relies on a statute establishing a cause of action and authorizing exemplary damages in specified circumstances or in conjunction with a specified culpable mental state, exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the damages result from the specified circumstances or culpable mental state.

TEX. CIV. PRAC. & REM. CODE ANN. § 41.003 (Vernon 1997).

**19.** The revised section 41.002, as amended by Senate Bill 25 read:
(a) This chapter applies to any action in which a claimant seeks exemplary damages relating to a cause of action.
(b) This chapter establishes the maximum exemplary damages that may be awarded in an action subject to this chapter including an action for which exemplary damages are awarded under another law of this state. This chapter does not apply to the extent another law establishes a lower maximum amount of exemplary damages for a particular claim.
(c) Except as provided by Subsections (b) and (d), in an action to which this chapter applies, the provisions of this chapter prevail over all other law to the extent of any conflict.
(d) Notwithstanding any provision to the contrary, this chapter does not apply to Section 15.21, Business and Commerce Code (Texas Free Enterprise and Antitrust Act of 1983), an action brought under the Deceptive Trade Practices–Consumer Protection Act (Subchapter E, Chapter 17, Business & Commerce Code) except as specifically provided in Section 17.50 of that Act, or an action brought under Chapter 21, Insurance Code.
Act of April 11, 1995, 74th Leg., R.S., ch.19, § 1,1995 Tex. Gen. Laws 108, 109 (also at TEX. CIV. PRAC. & REM. CODE ANN. § 41.002 (Vernon Supp.2002)).

ed ones in the old "laundry list." [20] Senate Bill 1 went into effect on May 30, 1995. Act of May 30, 1995, 74th Leg., R.S., ch. 260, § 9, 1995 Tex. Gen. Laws 2207, 2473, *amended by* Act of May 8, 1997, 75th Leg., R.S., ch.165, § 1.03, art. 4, sec. 4.01, 1997 Tex. Gen. Laws 327, 328.

Both versions (S.B. 1 and S.B. 25) of § 41.002(b) thus appeared in the statute, with the S.B. 1 listed first, followed by the S.B. 25 version. In 1997, Senate Bill 878, a general "housekeeping" bill ("part of the state's continuing statutory revision program" to make conforming and other necessary non-substantive corrections to existing laws) eliminated the version of § 41.002(b) as amended by Senate Bill 1, that is, the section with the "laundry list" with updated names. Act of May 8, 1997, 75th Leg., R.S., ch.165, § 1.03, art. 4, sec. 4.01, 1997 Tex. Gen. Laws 327, 328.

In 2001, an attempt to add a subsection "e" to section 41.002, which would have reinstated the exception for wrongful death actions in workers' compensation cases, failed. Tex. H.B. 2537, 77th Leg., R.S. (2001).

### Standards for Statutory Construction

 This case is one of statutory construction, and such matters are questions of law for the reviewing court to decide. *See Johnson v. City of Fort Worth,* 774 S.W.2d 653, 656 (Tex.1989). Proper construction of a statute is a question of law upon which a trial court has no discretion, *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992), hence no particular

deference is given to the trial court's findings. *Bandera Indep. Sch. Dist. v. Hamilton,* 2 S.W.3d 367, 370 (Tex.App.-San Antonio 1999, pet. denied.). The court is bound to construe a statute as written and, if possible, ascertain the legislative intent from the language used in the statute. *See Morrison v. Chan,* 699 S.W.2d 205, 208 (Tex.1985). A reviewing court must look to the intent of the legislature and construe the statute to give effect to that intent. *Union Bankers Ins. Co. v. Shelton,* 889 S.W.2d 278, 280 (Tex.1994).

In the instant case, the question before does not involve the construction of the language of the subsection of the statute at issue itself, but rather goes to the legislature's intent as to the application of a particular version of the subsection, in light of the passage of two different amended versions of the same subsection in the same legislative session. In ascertaining this intent, we are guided by the provisions of the Code Construction Act. TEX. GOV'T CODE ANN. § 311.003 (Vernon 1998). Courts may consider, among other matters:

(1) the circumstances sought to be attained;

(2) circumstances under which the statute was enacted;

(3) legislative history;

(4) common law or former statutory provisions, including law on the same or similar subjects;

(5) consequences of a particular construction;

---

**20.** Specifically, Senate Bill 1 amended:

Subsections (3) and (4) to change "Article 8306 et. seq., Revised Statutes" to "Title 5, Labor Code";

Subsection (10) to eliminate the words "the Texas Proprietary School Act", and changes "32" to "132";

Subsection (15) to change "the Texas Timeshare Act (Article 6573c, Vernon's Texas Civil Statutes)" to "Chapter 221, Property Code."

Act of May 27, 1995, 74th Leg., R.S., ch. 260, § 9, 1995 Tex. Gen. Laws 2207, 2473, *amended by* Act of May 8, 1997, 75th Leg., R.S., ch.165, § 1.03, art. 4, sec. 4.01, 1997 Tex. Gen. Laws 327, 328.

(6) administrative construction of the statute; and

(7) title (caption), preamble, and emergency provision.

TEX. GOV'T CODE ANN. § 311.023 (Vernon 1998).

We must also be guided by the principles that, in enacting a statute, it is presumed that the entire statute is intended to be effective and that the result is intended to be just, reasonable, and feasible of execution. TEX. GOV'T CODE. ANN. § 311.021(2), (3) & (5)(Vernon 1998).

## Analysis

■ We first note that the section 41.002(b), as amended in 1995 by Senate Bill 25, has no exception for worker's compensation cases, and has an effective date clause applying the amendment to all causes of action accruing on or after September 1, 1995. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.002(b)(Vernon Supp.2002); Act of April 11, 1995, 74th Leg., R.S., ch. 19, § 2, 1995 Tex. Gen. Laws, 108, 109. Normally, this would be a sufficient indication of legislative intent for us to find that the legislature intended the changes made by Senate Bill 25 to be applicable to the present case, in which the cause of action accrued after the bill's effective date. However, Senate Bill 1, enacted shortly after Senate Bill 25 and prior to the accrual of the cause of action in the present case, made different amendments to 41.002(b) and had an effective date of May 30, 1995. Thus, at the time that the cause of action arose in the instant case, and until section 41.002 was amended in 1997, there were two versions of section 41.002(b) in the statute, both with effective dates that would have apparently made them applicable to the case at bar. Hence, we may not simply rely on the effective date expressed in Senate Bill 25, but must more closely examine the actions and in-

tent of the legislature to determine which version of 41.002(b) was applicable.

Appellant asserts that Senate Bill 25, which became effective September 1, 1995 for all causes of action seeking exemplary damages that arose on or after that date, eliminated the exception upon which appellees relied. Thus, appellant argues, chapter 41, including its clear and convincing standard of proof, was applicable to appellees' case.

Appellees counter that, by passing the amendments to section 41.002(b)(1)-(15) in Senate Bill 1 some forty-six days later, the legislature intended to restore the exceptions eliminated by Senate Bill 25 and that, therefore, these exceptions remained in effect until they were definitively eliminated by Senate Bill 898 in 1997. They therefore posit that their case should be governed by the law as it stood prior to the 1995 amendment of Senate Bill 25, despite the effective date clauses of both Senate Bill 25 and Senate Bill 898, which applied the amendment eliminating the worker compensation exception (among others) to all causes of action accruing after September 1, 1995.

Appellant responds that the amendments made to section 41.002(b)(1)-(15) in Senate Bill 1 were merely conforming amendments to update the statutory references cited therein for as long as the exceptions remained in place, but were in no way an attempt to alter the repeal of the exceptions earlier passed in Senate Bill 25. Therefore, it maintains, on September 1, 1995, Senate Bill 25 went into effect and the former exceptions to chapter 41 listed in § 41.002(b)(1)-(15) were no longer effective. Thus the amended chapter 41 applied to appellees' cause of action, which accrued after that date. We agree.

The language of the section of Senate Bill 1 in which the amendment to section

41.002(b) is made indicates it is a conforming amendment, that is, an amendment to conform the section to properly reflect existing code and statute provisions. All the changes made to chapter 41 by this bill do that, and only that. Appellees argue that we should ignore the plain language of the amendment and they assert that the amendment found in Senate Bill 1 expresses the legislature's intent to make a substantive change to its tort reform legislation and reapply the exceptions it had so recently repealed. If the legislature wished, as appellees argue, to undo a major portion of the work done in Senate Bill 25, a hard-fought and controversial bill, by changes listed as "conforming amendments" buried deep in an education bill, we would have expected some clear legislative intent expressed to this effect. The mere fact that the fifteen subsections were restated in the course of making a conforming change to update the statutory references does not, in and of itself, prove intent to reenact those sections in opposition to the previous act of repealing the section, as the sections were required to be set out in any amending legislation under the provisions of the Texas Constitution. *See* TEX. CONST. art. III, § 36 (requiring that, in order to amend a law, the section to be amended must be reenacted and republished at length). However, this reenactment and republishment of the fifteen exceptions in the amendment made by Senate Bill 1, as required by art. III, section 36 of the constitution, does not automatically make the amendment irrec-

oncilable with the amendment passed in Senate Bill 25. TEX. GOV'T CODE ANN. § 311.025(c)(Vernon 1998). Indeed, the presumption is to the contrary. Section 311.025(c) very specifically speaks to such a situation, stating that

> ... text that is reenacted because of the requirement of Article III, Section 36, of the Texas Constitution is not considered to be irreconcilable with additions or omissions in the same text made by another amendment. Unless clearly indicated to the contrary, an amendment that reenacts text in compliance with that constitutional requirement does not indicate legislative intent that the reenacted text prevail over changes in the same text made by another amendment, regardless of the relative dates of amendment.

TEX. GOV'T CODE ANN. § 311.025(c)(Vernon 1998).

Stated simply, there must be clear proof, other than the mere re-listing of the exceptions themselves in Senate Bill 1, that the legislature intended to substantively reenact the exceptions via Senate Bill 1 and thereby supercede the action taken in Senate Bill 25 to reduce the exceptions from fifteen to three. We are unable to find any evidence of such intent. None of Senate Bill 1's bill analyses indicate an intent to reinstate the recently removed sections and, indeed, explicitly refute this argument, showing that the amendment in Senate Bill 1 was meant to make conforming and nonsubstantive changes.[21] Nor

---

**21.** This particular amendment first appeared in the committee substitute bill and so there are two bill analyses that mention it: the committee substitute version and the enrolled version of S.B.1. The text of the bill analyses is as follows:

> SECTION 34. CONFORMING AMENDMENT. Amends Section 41.002(b), Civil Practice and Remedies Code, to make conforming changes.

SENATE COMM. ON EDUCATION, BILL ANALYSIS, Tex. S.B. 1 (Committee Substitute Version), 74th Leg., R.S. (1995).

> SECTION 9. CONFORMING AMENDMENT. Amends Section 41.002(b), Civil Practice and Remedies Code, to make nonsubstantive and conforming changes.

SENATE COMM. ON EDUCATION, BILL ANALYSIS, Tex. S.B. 1 (Enrolled Version), 74th Leg., R.S. (1995).

have we found, in an extensive review of the numerous tapes of all the hearings and floor debates of Senate Bill 1, itself a highly controversial and significant amendment of the education code, any argument, debate, testimony or even discussion of this change to section 41.002 of the Texas Civil Practice and Remedies Code. There is nothing in Senate Bill 1's legislative history to indicate any intent to repeal the legislature's arduous efforts in passing the changes made to Texas tort litigation by Senate Bill 25. The only expression of any intent behind this amendment is found in the plain language of its title "conforming amendment" and the language of the bill analyses, which indicate that it was, indeed, a conforming, nonsubstantive amendment.

Additionally, appellees' theory that the legislature intended to make a substantive amendment to section 41.002(b) by way of Senate Bill 1, and so repudiate its action repealing the amendments in Senate Bill 25, cannot be harmonized with the apparent intent of the rest of the statute. Assuming, as appellees insist, that the legislature affirmatively wished to repeal its earlier amendment to section 41.002(b) and return the previously listed exceptions to the statute, then section 41.002(d), which was not amended by Senate Bill 1, would be rendered completely redundant and unnecessary. If the legislature truly wished to undo its amendments to section 41.002(b) made by Senate Bill 25, such action would necessitate repealing section 41.002(d) as well.[22] Furthermore, at least as to wrongful death actions under section 26, article XVI, if the legislature intended to reinstate the exception of these actions from the application of chapter 41, it would have repealed section 41.003(a)(3), also passed as part of Senate Bill 25, which specifically set the standards of recovery for exemplary damages under chapter 41 for wrongful death actions such as that before us today.[23] TEX. CIV. PRAC. & REM. CODE ANN. § 41.003(a)(3) (Vernon 1997). Sections 41.002(d) and 41.003(a)(3), which were not affected in any way by Senate Bill 1, cannot be harmonized with the Senate Bill 1 version of subsection (b). The Senate Bill 1 version of 41.002(b) likewise does not harmonize with section 41.002(a), which was also amended by Senate Bill 25.[24] On the other hand, the Senate Bill 25 version of section

---

**22.** Subsection (d) reads:

Notwithstanding any provision to the contrary, this chapter does not apply to Section 15.21, Business and Commerce Code (Texas Free Enterprise and Antitrust Act of 1983), an action brought under the Deceptive Trade Practices–Consumer Protection Act (Subchapter E, Chapter 17, Business & Commerce Code) except as specifically provided in Section 17.50 of that Act, or an action brought under Chapter 21, Insurance Code.
TEX. CIV. PRAC. & REM. CODE ANN. § 41.002(d)(Vernon 1997).

**23.** Section 41.003(a) reads:

(a) Except as provided by Subsection (c), exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from:
. . . .
(3) wilful act or omission or gross neglect in wrongful death actions brought by or on behalf of a surviving spouse or heirs of the decedent's body, under a statute enacted pursuant to Section 26, Article XVI, Texas Constitution. In such cases, the definition of "gross neglect" in the instruction submitted to the jury shall be the definition stated in Section 41.001(7)(B).
TEX. CIV. PRAC. & REM. CODE ANN. § 41.003(a)(Vernon 1997).

**24.** As amended, the section reads: "This chapter applies to any action in which a claimant seeks exemplary damages relating to a cause of action." TEX. CIV. PRAC. & REM. CODE ANN. § 41.002(a)(Vernon 1997).

41.002(b) very neatly harmonizes with sections 41.002(a) & (d) and 41.003(a)(3), with which it was expressly enacted.[25] Section 41.002(d) clearly indicates a very deliberate choice on the part of the legislature to reduce the number of exceptions from fifteen to three, and section 41.003(a)(3) clearly indicates an express understanding and intent to extend the application of chapter 41 to wrongful death cases in workers' compensation actions. This is supported by the legislative history as revealed in legislators' comments at public hearings [26] on Senate Bill 25.

Applying Senate Bill 25's version of section 41.002(b) creates a harmonious, logical and unified chapter 41; applying Senate Bill 1's version of section 41.002(b) creates irreconcilable conflicts between various sections of chapter 41, provisions which cannot be enforced, redundancies, and non sequiters. We find no support for appellees' argument that the legislature intended for Senate Bill 1's version of section 41.002(b) to prevail over the version of 41.002(b) enacted by Senate Bill 25.

■ Appellees alternatively argue that the later-passed bill should control, citing section 311.025(b) of the Code Construction Act. TEX. GOV'T CODE ANN. § 311.025(b)(Vernon 1998). This rule of statutory construction only applies if the two amendments cannot be harmonized so that effect can be given to each. *Id.*

Appellant asserts that the amendments can be harmonized and so the later-passed rule of construction does not apply. It

---

**25.** That subsection reads:

> (b) This chapter establishes the maximum exemplary damages that may be awarded in an action subject to this chapter including an action for which exemplary damages are awarded under another law of this state. This chapter does not apply to the extent another law establishes a lower maximum amount of exemplary damages for a particular claim.

> Act of April 11, 1995, 74th Leg., R.S., ch.19, § 1, 1995 Tex. Gen. Laws 108, 109 (also at TEX. CIV. PRAC. & REM. CODE ANN. § 41.002(b)(Vernon Supp.2002)).

**26.** At the February 14, 1995 meeting of the Senate Economic Development committee, Senator Sibley, in describing the committee substitute commented:

> "In all cases in which punitive damages are available in Texas law, they will be governed under this bill except for the Texas Free Enterprise and Anti–Trust Act. We felt that antitrust actions which were state causes of action should not be governed by this bill."

> *The Texas Tort Reform Act: Hearing on Tex. S.B. 25 Before the Senate Comm. on Econ. Dev.,* 74th Leg., R.S.(Audiotape, February 14, 1995)(statement of Senator Sibley).

> In laying out changes to the Senate version of the bill made by the House committee substitute to Senate Bill 25 at the March 27, 1995 meeting of the House Committee on State Affairs, the chair, Representative Seidlits described one of the changes as follows:

> "Section 41.003(a)(3), I believe that's it, it talks about, and there's a section in the Texas constitution, section 26, article 16, that actually talks about, I believe, wrongful death cases, punitive damages and gross neglect. The bill as written recognizes that the limitations, whatever, in the bill on punitive damages would apply in those cases under that section and it gives a definition of gross neglect in the substitute.

> And in [sic] the committee substitute additionally exempts actions brought under DTPA and/or chapter 21, Insurance Code."

> *The Texas Tort Reform Act: Hearing on Tex. S.B. 25 Before the House Comm. on State Affairs,* 74th Leg., R.S.(Audiotape, March 27, 1995)(statement of Representative Seidlits).

> All of the above provisions are part of the final enacted Senate Bill 25 as to § 41.002(d) (enacting the sole three exceptions to the application of chapter 41—actions under the Texas Free Enterprise and Anti–Trust Act, DTPA and chapter 21, Insurance Code) and § 41.003(a)(3) (enacting the standard of gross neglect to be used in worker's compensation wrongful death actions for exemplary damages). TEX. CIV. PRAC. & REM. CODE ANN. §§ 41.002(d) & 41.003(a)(3)(Vernon Supp.2002 & Vernon 1997).

argues that Senate Bill 1 amended section 41.002(b)(1)-(15), which was still in effect through August 30, 1995, in order to bring it in conformity with numerical and title changes for the statutes and codes cited therein. When the substantive amendments of Senate Bill 25 went into effect, the conformed provisions of section 41.002(b)(1)-(15) were eliminated, except for those causes of action that had accrued prior to its effective date. Thus Senate Bill 1's amendment only affected those causes of action that accrued prior to September 1, 1995.[27]

We find appellant's argument as to the harmony of the two bills simple and compelling. This argument has the merit of harmonizing all the language in the statute, including subsection (d) and the enactment of section 41.003(a)(3), being consistent with the legislative history of Senate Bills 25 and 1, and also being consistent with the plain language and legislative history of the Senate Bill 1 amendment.[28]

Considering the plain language of the amendments, the appropriate standards of statutory construction, and the intent of the legislature as revealed in its legislative history, we find that the version of section 41.002 passed in Senate Bill 25, extending the application of chapter 41 to all causes of action except for the three exceptions

listed in subsection (d), to be controlling in this case.[29]

Appellees have argued that the Texas Supreme Court and the San Antonio Court of Appeals have ruled otherwise, citing *Continental Coffee Prod. v. Cazarez,* 937 S.W.2d 444, 452 n. 4 (Tex.1996) and *Waterfield Mortgage Co. v. Rodriguez,* 929 S.W.2d 641, 645 (Tex.App.-San Antonio 1996, no writ). We note that in *Cazarez,* the language cited is *dicta* as the issue was not directly before the court. As for *Waterfield,* the San Antonio Court of Appeals appears to have recently retreated from its statements about the applicability of chapter 41 expressed in that opinion. When the question of whether the amendment of Senate Bill 1 or Senate Bill 25 was controlling as to the applicability of chapter 41 to the formerly-listed exceptions was directly placed before the San Antonio Court of Appeals, it held, as we do today, that chapter 41 applies to all workers' compensation wrongful death causes of actions accruing after September 1, 1995. *Hall v. Diamond Shamrock Ref. Co,* 82 S.W.3d 5, 20, 2001 Tex.App. LEXIS 4217, *28–34 (Tex.App.-San Antonio 2001, no pet. h.).

Having found that chapter 41, as amended by Senate Bill 25, was applicable to the

---

**27.** In addition to the "four months of legitimacy" that appellant argues the "old" section 41.002(b)(1)-(15) had from May 27 to September 1, 1995, since the prior law was continued in existence for those causes of action accruing before September 1, 1995, Senate Bill 1 would have also served the practical purpose of making sure that limited continuing law was in conformity with existing statutory and code provisions. Act of May 30, 1995, 74th Leg., R.S., ch.19, § 2,1995 Tex. Gen. Laws 108,113, *amended by* Act of May 8, 1997, 75th Leg., R.S., ch.165, § 1.03, art. 4, sec. 4.01, 1997 Tex. Gen. Laws 327, 328.

**28.** Indeed, although not part of the legislative history of either Senate Bill 1 or 25, the

subsequent action of the Legislature in 1997 with Senate Bill 898 and the failure to pass House Bill 2537 in 2001 seem to even more strongly confirm that the legislature intended that the sole exceptions to chapter 41 to be those three actions listed in section 41.002, subsection (d).

**29.** There is no dispute that appellees' cause of action accrued on October 3, 1995, the date of Torres's death. Chapter 41 as amended by Senate Bill 25, applies to all causes of action arising after September 1, 1995 that are not specifically excepted by section 41.002(d). Appellees' cause of action does not fall under the exceptions of subsection (d).

case at bar, the proper standard of proof that should have been applied was that of clear and convincing evidence. The trial court thus erred in its determination of the law of the case and abused its discretion in providing the jury the erroneous preponderance of the evidence standard in the submitted jury question number one.[30]

### Relief

■■■ Appellant cites *Wyndham Hotel Co. v. Self*, 893 S.W.2d 630, 635 (Tex.App.-Corpus Christi 1994, writ denied), and *Clayton W. Williams, Jr., Inc. v. Olivo*, 952 S.W.2d 523, 529 (Tex.1997), for its assertion that, upon finding the complained-of charge error, this Court should reverse and render a take-nothing judgment against appellees, rather than reverse and remand for a new trial. Appellant argues that since appellees had a burden "to obtain a finding of gross negligence 'by clear and convincing evidence,'" and failed to do so, appellant is entitled to a rendition of judgment under the authorities cited above. We disagree.

■■■ Rendition is only appropriate when the erroneous question is immaterial, that is, where the answer to the question fails to submit a controlling issue because there is some missing determination of necessary specific factual predicates to establish a legal duty which thus renders the question of no legal consequence. *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 840 (Tex.2000). Where there is no required determination of predicate facts to establish a legal duty, the question then is an attempt to submit a controlling issue and is merely *defective* as opposed to *immaterial. Id.* The proper relief for a defective, but not immaterial, question is remand. *Id.* at 839–40; *see also Durham Transp. v.*

*Valero*, 897 S.W.2d 404, 409 (Tex.App.-Corpus Christi 1995, writ denied)(submission of wrong standard of care was a defective rather than omitted charge and so remand, rather than rendition, was appropriate).

The question at issue in the present case, utilizing the wrong standard of proof, is defective, but not immaterial. Accordingly, the proper relief is remand, not rendition.

## LEGAL SUFFICIENCY OF THE EVIDENCE

Although we have already found reversible error entitling appellant to a remand, we nonetheless consider the first issue raised, because if the evidence presented was legally insufficient, then appellant is entitled to a rendition in its favor.

Appellant maintains that the record in this case supports only a finding of ordinary negligence and that evidence of simple negligence is not enough to prove either the objective or subjective elements of gross negligence. Appellees disagree.

■■■ If an appellant is attacking the legal sufficiency of an adverse ruling on an issue on which he did not have the burden of proof, he must demonstrate on appeal that there is no evidence to support the adverse finding. *Spohn Hosp. v. Mayer*, 72 S.W.3d 52, 68 (Tex.App.-Corpus Christi 2001, pet. filed). The standard of review for an attack on the legal sufficiency of the evidence requires us to consider all of the evidence in the light most favorable to the prevailing party, indulging all reasonable inferences in that parties' favor. *Id.* If there is any evidence of probative force to support the finding, the court must overrule the no evidence point. *Id.; ACS In-*

---

**30.** As the jury charge did not conform to the standards set out in chapter 41, there were other errors in the questions and instructions submitted to the jury, but the only one before us on appeal is the question of the standard of proof.

*vestors, Inc. v. McLaughlin,* 943 S.W.2d 426, 430 (Tex.1997). If more than a scintilla of evidence is offered on a fact, the evidence is legally sufficient to support the jury's finding on that matter. *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex. 1983). In evaluating legal sufficiency, we determine whether the proffered evidence as a whole rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 25 (Tex.1994). "When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Con/Chem Inc.,* 650 S.W.2d at 63. It is only when reasonable minds cannot differ that evidence lacks probative force that it is "no evidence." *Id.* A challenge to the legal sufficiency of the evidence supporting a vital fact necessary for recovery will be sustained if there is a total absence of such evidence, the rules of evidence prohibit consideration of the only such evidence offered, the evidence offered is no more than a scintilla, or the evidence offered conclusively establishes the opposite of the vital fact. *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997).

Appellees filed a lawsuit for gross negligence pursuant to Texas Constitution article XVI, section 26 and the Workers' Compensation Act. As we have earlier found, appellees' action was governed by the current version of Chapter 41. With the changes in 1995, the definition for "gross negligence" was replaced by a definition for "malice," and currently there is no definition in section 41.001 for "gross negligence."[31] However, the definition for malice under section 41.001(7)(B) is essentially identical to the old "gross negligence standard," which was submitted to the jury in this case.[32] This is the definition that the legislature now permits, under the terminology of "gross neglect," to those pursuing an action under a statute enacted pursuant to section 26 of article XVI of the Texas Constitution and hence the appropriate one for our review.[33] TEX. CIV. PRAC. & REM. CODE ANN. § 41.003(a)(3) (Vernon 1997). Accordingly, we will rely on the already established body of case law that interprets the "gross negligence" standard.

Gross negligence involves proof of two elements: (1) viewed objectively from the actor's standpoint, the act or omission must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and (2) the actor must have actual,

---

**31.** Section 408.001 of the Labor Code, which still contains the "gross negligence" language, has not been amended since 1993, two years prior to the 1995 tort reform measures. TEX. LAB. CODE ANN. § 408.001 (Vernon 1996).

**32.** Malice is defined as:

(A) a specific intent by the defendant to cause substantial injury to the claimant; or

(B) an act or omission

(i) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and

magnitude of the potential harm to others; and

(ii) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety or welfare of others.

TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(7) (Vernon 1997).

**33.** The statute also permits a person suing for a wrongful death action under Section 26, Article XVI and seeking exemplary damages to prove that the harm came from a willful act or omission. TEX. CIV. PRAC. & REM. CODE ANN. § 41.003(a)(3) (Vernon 1997).

subjective awareness of the risk involved, but nevertheless proceed in conscious indifference to the rights, safety, or welfare of others. *See Mobil Oil Corp. v. Ellender,* 968 S.W.2d 917, 921 (Tex.1998), citing *Moriel,* 879 S.W.2d at 23. In reference to the first requirement, the "extreme risk" means the likelihood of serious injury to the plaintiff. *Id.* In reference to the second requirement, ordinary negligence rises to the level of gross negligence when it can be shown that the defendant was aware of the danger but his acts or omissions demonstrated that he did not care to address it. *Louisiana–Pacific. Corp. v. Andrade,* 19 S.W.3d 245, 246–47 (Tex.1999); *Burk Royalty Co. v. Walls,* 616 S.W.2d 911, 922 (Tex.1981). Proof of the second element may be made through either direct or circumstantial evidence. *Moriel,* 879 S.W.2d at 23.

Evidence of simple negligence is not enough to prove either the objective or subjective elements of gross negligence. *See Universal Servs. Co., Inc. v. Ung,* 904 S.W.2d 638, 641 (Tex.1995). Furthermore, a corporation may not be held liable for punitive damages for gross negligence unless the corporation itself commits gross negligence, authorized or ratified an agent's gross negligence, was grossly negligent in hiring an unfit agent, or committed gross negligence through the actions or inactions of a vice-principal. *Ellender,* 968 S.W.2d at 921–22.

In their petition, as amended, the appellees alleged that Sliney, while acting in the course and scope of his employment, was grossly negligent by failing to follow the rules and regulations for the safety of employees and others in the unloading of equipment in that he failed to use the appropriate and necessary instruments to unload the fuel tank, failed to warn Torres to clear the area while the tank was being unloaded, and failed to use the appropriate

and necessary personnel to assist in the unloading of the fuel tank, all of which were known or should have been known by appellant. Alternatively, they alleged that appellant failed to provide Torres a safe place to work, failed to provide and enforce rules and regulations for the safety of employees and others to warn them, under certain conditions, of the hazards of their employment, and failed to exercise care in selecting careful and competent employees. The jury answered "yes" to the sole liability question, "Do you find by preponderance of the evidence that the gross negligence of R & R Oil Field Services, Inc. was a proximate cause of Gregorio Torres, Jr.'s death?"

On appeal, appellant maintains that appellees' principal complaints below were that appellant failed to establish sufficient safety policies and procedures and failed to properly investigate Sliney's qualifications before hiring him. Appellant contends that the evidence supports neither contention and so it was not grossly negligent. It maintains that: (1) appellant was not grossly negligent; (2) Sliney was not appellant's vice-principal and so his conduct could not give rise to corporate liability for gross negligence; and (3) Sliney was not grossly negligent. The Torres family counters that the evidence supports a finding of gross negligence for the following reasons: (1) the acts directly attributable to the corporation support a determination that the corporation itself was grossly negligent; and (2) the corporation can also be liable if it commits gross negligence through the actions or inactions of its vice-principal.

### The Objective Element

#### 1. <u>Sliney</u>

Viewed from the standpoint of the actor, under the objective element, "extreme risk" is not a remote possibility of

injury or even a high probability of minor harm, but rather the likelihood of serious injury to the plaintiff. *See Ung*, 904 S.W.2d at 641; *Moriel*, 879 S.W.2d at 22. Here, the actors are appellant and its employee, Sliney. From the standpoint of the actors, the evidence before the jury revealed that, immediately prior to the lift, Torres was stationed between the cherry picker and a thousand-pound tank, which was secured for unloading with a chain generally used to secure a load while on a trailer. As Sliney operated the cherry picker to lift the tank, Torres remained in contact with the load to guide it. As Sliney reversed the crane, the load became unbalanced. While holding onto the tank, Torres was lifted when it became unbalanced and, upon his releasing it, he fell and the tank fell on top of him.

 Sliney acknowledged the company's safety manual and ultimately agreed that an employee should stay away from a suspended load as provided in the manual. Pritchard, the safety manager, testified that at the time of the incident he did not believe he knew what the rigging manual was. He had no system in place to check an employee's skill or experience level in the operation of heavy equipment. We conclude that the evidence is legally sufficient to establish that Sliney's executing the lift with Torres's proximity to the tank prior to the lift involved an extreme degree of risk to Torres.

 The evidence is also legally sufficient to establish that Sliney's executing the lift without the proper equipment in place involved an extreme degree of risk to Torres. All witnesses questioned about the proper method to rig the tank agreed that the tank was not properly secured, the proper equipment for the lift was not used, and Sliney should not have made the lift until the load was secure.

## 2. R & R

 In deciding whether actions are directly attributable to a corporation, the reviewing court must consider all the surrounding facts and circumstances rather than simply judging individual elements or facts. *Ellender*, 968 S.W.2d at 922. Reviewing the record as to the corporation's actions and inactions, we note that although the appellant company had a "very comprehensive" safety manual addressing "every possible aspect that you could think of about slings, about crane capacities, anything that has to do with rigging up of a load to be lifted and moved," at the time of the incident, the safety manager did not know what it was. The company provided no training as to the safe rigging of a load. The company provided no training as to the proper method to unload. The video demonstration before the jury purported to show the proper method to load and unload the fuel tank. The procedure, however, excluded the use of a shackle, a u-shaped device which the safety manager anticipated in his testimony would be used to secure the wire rope to the lifting lug on the tank. While describing the proper way to secure the load concurrently with the video presentation, the safety manager testified that a wire rope would be attached to a lifting lug on the end of the tank with a device called a shackle. He then noticed that a shackle was not used in the video demonstration. The jury as the sole trier of fact was free to draw its own inferences from the testimony before it.

The company had no procedures in place to monitor the skill or qualifications of an individual using heavy equipment to make a lift. Problems were relayed by word of mouth. Although Sliney, a company supervisor, had never made a lift of a tank before, he had the unbridled authority to make it. Another supervisor, Monty Kel-

ler, had not read the safety manual for over two years although he had the responsibility to train his employees regarding safety procedures. There is legally sufficient evidence that the acts and omissions of appellant, viewed objectively from its point of view, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.

### The Subjective Element

■ The evidence establishes that Sliney was aware of the risk involved. To Pritchard, Sliney urged that the manner in which Torres had rigged the load was "strange" and to Custer, he said he "had doubts" about the way the tank was hooked and the chain was used. And, he stated, he probably would have rigged the lift differently. However, he proceeded with the lift.

The safety manager and the company president concluded that a qualified crane operator would not have made the lift while Torres was in close proximity to the load. They testified that the chain was not the proper chain to use for a lift and that the manner it was used to secure the load was also improper. Conversely, Sliney testified that the chain "could" be a proper chain "if it had been rigged differently." However, he had no prior experience making a lift involving that particular kind of tank. He did not know the weight of the tank or its contents, if any. In addition, he would not have used tag lines to make the lift, whereas, the safety manager testified that tag lines would have been appropriate. The video demonstration of a proper lift appellant presented for the jury showed tag lines for the lift and no one near the load.

Excluding Sliney, the other witnesses testified that the responsibility to ensure the load to be lifted was secure was that of the crane operator. The company president testified that Sliney had the authority to make the lift. The evidence before the jury showed that Sliney disregarded safety procedures by not ensuring that the tank was properly secured, the proper equipment to secure the tank was used, and Torres was clear of the lift area.

A trial exhibit of appellant showed Sliney's attendance at a meeting on June 21, 1995, in which Pritchard covered the subject of "crushing accidents." Pritchard testified that at that meeting, he reviewed the procedure, stating, "Always keep a safety distance from equipment to avoid being crushed from mechanical failure or operator error." He also covered the procedure stating, "Never get under any suspended load or equipment part, such as a bucket, a blade, boom, etcetera." [34] The incident leading to the death of Torres occurred less than four months later. In its appellate brief, appellant contends that Torres, who also attended the meeting, "apparently disregarded these admonitions." So did Sliney. This establishes that, while armed with knowledge that the chain as used to secure the load was improper, he proceeded with the lift despite knowledge of the safety procedure requiring an employee to maintain a safe distance from the load to be lifted. His actions were not merely momentary thoughtlessness, inadvertence, or error in judgment. *Moriel,* 879 S.W.2d at 22.

The probative evidence establishes that the lift should not have been made while Torres was in the "zone of danger" in close proximity to the load to be lifted and that Sliney was consciously indifferent toward the safety of Torres, who was between the heavy equipment Sliney was

---

**34.** At trial, both procedures were read aloud by R & R's counsel.

operating and the thousand-pound tank to be lifted, while holding on to the tank. We reject appellant's contention that Sliney was not grossly negligent. Similarly, we reject the contention that appellant was not grossly negligent.

The evidence before the jury was that Sliney was a supervisor. He had the authority to and did operate a crane on the unquestioned, untested assumption that he could do so safely. The company president, the company safety manager, and the company superintendent testified that Sliney should not have executed the lift until Torres got out of the way because "it's putting him in danger." The company knew about perils involving crushing injuries and employee proximity to loads. The company, however, gave Sliney the authority to operate the cherry picker. Sliney had the authority to operate equipment and perform a lift without any prior experience with the particular load to be handled. There is more than a scintilla of evidence that the company knew about the peril but did not care. We hold that the evidence was legally sufficient to support a finding that the corporation's own acts and omissions involved an extreme degree of risk to employees like Torres.

Relying upon *Hammerly Oaks, Inc. v. Edwards,* 958 S.W.2d 387, 391–92 (Tex. 1997), appellant contends it is not liable for punitive damages because Sliney was not a vice-principal of the corporation. Because we hold that the evidence before the jury was legally sufficient to support a finding that appellant itself was grossly negligent, we need not address appellant's argument regarding the vice-principal theory of liability.

The jury's answer on punitive damages was conditioned on a finding of gross negligence. If there is any evidence of probative force to support the finding of the jury, the court will overrule the no evidence point. *ACS Investors,* 943 S.W.2d at 430. The evidence is more than the scintilla needed to satisfy a legal sufficiency or "no-evidence" standard. We hold that there is legally sufficient evidence to uphold the punitive damages award against appellant and, therefore, overrule appellant's first issue.

## CONCLUSION

Having sustained appellant's second issue, we reverse the trial court's judgment and remand the case for further proceedings.