

# NUMBER 13-25-00255-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

FRANCISCO HERNANDEZ JR., INDIVIDUALLY
AND AS REPRESENTATIVE OF THE ESTATE OF
FRANCISCO HERNANDEZ SR., DECEASED
AND SIMON HERNANDEZ,                                    Appellants,

v.

SEYMOUR CONSTRUCTION, LLC AND
BLAKE BERTLING EQUIPMENT RENTAL, LLC,          Appellees.

## ON APPEAL FROM THE 267TH DISTRICT COURT
## OF DEWITT COUNTY, TEXAS

## MEMORANDUM OPINION

**Before Justices Silva, Peña, and Fonseca**
**Memorandum Opinion by Justice Fonseca**

In this case arising out of a forklift accident, appellants Francisco Hernandez Jr.,

individually and as representative of the estate of Francisco Hernandez Sr., and Simon

Hernandez brought wrongful death claims against appellees Seymour Construction, LLC (Seymour) and Blake Bertling Equipment Rental, LLC (BBER). By three issues on appeal, Hernandez argues the trial court erred by dismissing all of his claims as a matter of law prior to trial. Because we find that judgment as a matter of law was improper on Hernandez's negligent entrustment claims, we affirm in part and reverse and remand in part.

## I. BACKGROUND

Francisco Hernandez Sr. (Francisco) began working for his brother Roger's metal building construction business around 2012. Seymour regularly hired Roger's company to perform work at its jobsites, and either Roger or Seymour would rent equipment from BBER for Roger's employees to use. In July 2020, Seymour hired Roger's company to perform work on a metal building roof in the city of Nordheim in DeWitt County. On July 24, Roger, Francisco and a co-worker were working at that site using an all-terrain telehandler[1] manufactured by JLG and rented by Seymour from BBER. Francisco and the co-worker were standing in a "man basket" attached to the forklift, around eighteen feet in the air, when the co-worker stepped out of the basket so he could work on the trim of the roof. The basket tipped over and fell to the ground with Francisco, causing his

---

[1] "Telehandler" and "forklift" refer to "two different categories of equipment that serve a few of the same functions." JLG, *Why Some People Confuse Telehandlers With Forklifts*, https://www.jlg.com/en/directaccess/why-some-people-confuse-telehandlers-with-forklifts (last visited May 15, 2026).

> The primary difference between a telehandler and the Class VII vertical mast-type forklift is the telehandler's ability to lift up and over an obstacle. Like the name implies, vertical mast forklifts only lift up vertically. Both types of equipment lift comparable amounts of weight, have similar footprints and turning radii and can use attachments, but only telehandlers have a telescoping boom that reaches up and out or up and over obstacles. . . . The telehandler is used during construction of the building, and the forklift is used after the fact.

*Id.* Because the parties refer to the equipment at issue in this case as a forklift, we will do the same.

death.

Francisco's sons (appellants herein, collectively referred to as Hernandez) filed the instant suit against Seymour in 2021, asserting claims of negligence, gross negligence, and vicarious liability. Hernandez later filed an amended petition adding BBER as a defendant. In his third amended petition filed in 2024, Hernandez alleged that the man basket attached to the forklift "was not a manufacturer approved attachment," that BBER knew the basket was not approved, and that Seymour "had custody and control" of the basket. Hernandez asserted, among other things, that both appellees were negligent by entrusting the equipment at issue to Roger, who was "an incompetent, unqualified, and uncertified forklift operator." Hernandez further asserted that BBER was negligent for "[f]ailing to warn against the misuse of the unauthorized and non-approved attachment" and that Seymour was negligent by "failing to adequately warn [Roger] and [Francisco] and others of the known hazards."

On February 7, 2024, BBER filed a motion for no-evidence summary judgment on Hernandez's gross negligence claim. It filed an amended motion five days later, and Hernandez filed a response, including evidence. The trial court denied the motion.

On February 23, 2024, Seymour filed a combined no-evidence and traditional motion for summary judgment, arguing there was no evidence of duty, breach, or causation. The motion included an affidavit and deposition testimony by Seymour's owner Matt Dockery, as well as deposition testimony by Roger. Hernandez filed a response, to which he attached evidence, including reports by experts Robert Bullen and Russell Hinds, and deposition testimony by BBER's founder and owner Blake Bertling.

On September 17, 2024, BBER filed a "Rule 166(g) Motion for Judgment as a

3

Matter of Law," arguing that Hernandez's negligence and gross negligence claims fail because BBER did not owe a duty, breach any duty, or cause any injury to Francisco. BBER further argued that "a negligent entrustment claim does not apply to industrial equipment, such as a forklift." BBER attached Roger's deposition and excerpts from Hinds's deposition.[2] Hernandez filed a response to the motion, attaching evidence including excerpts from the forklift owner's manual, invoices from BBER addressed to Seymour, copies of text messages between Roger and Bertling, and Hinds's report and affidavit.

After a hearing, the trial court granted both appellees' motions and dismissed all of Hernandez's claims with prejudice.[3] This appeal followed.

## II.  EVIDENCE

### A.  Roger

Roger testified that as of July 2020, his company had been in operation for eight to ten years, and had only two employees, including his younger brother Francisco. Roger said Francisco had "worked with [him] mostly all his life" erecting metal buildings, and they both had thirty to forty years' experience in the trade. However, Roger has never taken a class on how to operate a forklift and has no license or certification for its use.

When asked to explain what happened on July 24, 2020, Roger stated: "It was just

---

[2] On September 23, 2024, Hernandez filed "Objections" to BBER's Rule 166(g) motion, arguing that "said motion does not exist in Texas" and that the arguments therein were already made and rejected as part of BBER's no-evidence summary judgment motion. Hernandez asked the trial court to "dismiss" the motion or, in the alternative, to reset the hearing on the motion to give him at least twenty-one days to respond, which he would have been entitled to had the motion been filed under Rule 166a. The record reflects that the hearing on the motion was not held until February 3, 2025, and Hernandez does not argue on appeal that Rule 166(g) was an improper vehicle for appellees' arguments.

[3] Hernandez was ordered to pay BBER's costs of court; however, the order dismissing the claims against Seymour states that each party is responsible for their own costs.

4

an accident. . . . The basket fell off the forks, it wasn't—wasn't in the pockets. So I guess when [Francisco] hit the ground, he hit—he landed on his head or something." When asked who was to blame, he said "I have no idea" and reiterated that "[i]t was just a freak accident." He later agreed with counsel that, "as the forklift operator, as the business owner and operator, as the captain of the ship, it was . . . [his] job . . . to make sure that all of [his] equipment was being operated properly."

Roger explained that he obtained the "homemade" wooden man basket at issue from a jobsite in Gillett in Karnes County, when "the contractor left it there and the owner gave it to me." He said he used that particular basket in his business "every day" for "about four or five years." According to Roger, the basket had "pockets" underneath that fit the prongs of the forklift, and, to attach the basket to the forklift, the forklift operator would simply "stick the forks in the pockets" and "pick it up." Roger said that the forklift they were using that day was the same one they had previously used for many years, and that its prongs were the same length as the pockets in the basket. The following colloquy occurred:

| Q [BBER's counsel] | All right. So when the basket was attached to the forklift you were using, did any portion of the forks stick out past the basket? |
| --- | --- |
| A [Roger] | No. |
| Q | All right. That being true, how did you safety chain or pin the—the basket to your forklift? |
| A | It had a chain on top, but it wasn't—I don't think it was on that day. It wasn't on that day. |
| Q | Okay. So the chain on top, had it been used, would that have prevented this incident you think? |
| A | No. The—The forks weren't in the pocket that day. Not—Nobody checked it. None of us checked it. |

5

Q                    So whose—whose job was it to connect the basket or hook the basket under the forks?

A                    I guess whoever was operating it.

. . . .

Q                    The chain that you talked about as the safety chain, if it was connected to the forklift, where would it connect to the forklift?

A                    You wrap it around the—the mast on the fork, but with—most of the time, it didn't get used.

Roger denied having any recollection of "putting the basket on the forklift" that day, nor could he recall whether there was ever a time when the basket "slipped and the chain had caught it." When asked whether his crew normally worked without harnesses, he said "Yeah . . . . I had them, but . . . nobody . . . would ever want to wear them." He agreed that the forklift was working properly at all times on July 24 and that Seymour paid for the rental.

Roger stated that he regularly rented the specific forklift at issue from BBER, and BBER would "move it from job site to job site for [him]." BBER would also move the man basket along with the forklift. He explained that he has used a "whole bunch" of different man baskets in his career, and most of them were made by himself and his crew. He recalled that he once used a basket which was "not shop made" and "[i]t was no different. It was the same thing."

Seymour's counsel provided Roger with a copy of the forklift's operation and safety manual, published by the manufacturer JLG. It states in relevant part:

> The operator of the machine must not operate the machine until this manual has been read, training is accomplished and operation of the machine has been completed under the supervision of an experienced and qualified operator. Operation within the U.S.A. requires training per [Occupational Health and Safety Act (OSHA) regulation] 1910.178.

6

. . . .

When lifting personnel, USE ONLY a JLG approved personnel work platform, with proper capacity chart displayed in the cab.

. . . .

Do not use unapproved attachments for the following reasons:

- Range and capacity limitations for "will fit," homemade, altered, or other non-approved attachments cannot be established.

- An overextended or overloaded telehandler can tip over with little or no warning and cause serious injury or death to the operator and/or those working nearby.

- The ability of a non-approved attachment to perform its intended function safely cannot be assured.

WARNING

Use only approved attachments. Attachments which have not been approved for use with your telehandler could cause machine damage or an accident.

The manual included a list of "JLG Supplied Attachments" which were approved for use with the forklift. When asked whether he read the manual upon first renting this particular forklift, Roger replied: "They're all the same, I guess, about 20 years ago, 30 years ago."

**B.    Bertling**

Bertling testified that he and his wife have owned BBER for seventeen years. As part of his business, he employs truck drivers to deliver rented equipment to customers on flatbed trailers; on occasion, BBER will also transport equipment from one jobsite to another for a customer. He said that BBER provides delivery for about 35 to 40 percent of its rental customers, and it charges an additional fee for the service.

According to Bertling, BBER does not do background checks or credit checks on its customers, nor does it verify that the customer is insured. Further, though Bertling and his employees went through "a forklift and lift training course" about ten years ago, BBER

7

does not ask its customers whether they have undergone the same training, nor does it ask whether they will read the operating and safety manual. Rather, in order to rent equipment from BBER, a customer must only produce a driver's license and a form of payment, and the customer must sign a rental contract which states in part:

4.  Lessee agrees that the Equipment will be used solely for the purposes for which the Equipment was manufactured and intended unless Lessor consents to other use in writing. Lessee is solely responsible for seeing that the Equipment is used only by persons competent in its operations, or under Lessee's control.

5.  Lessee agrees to save, hold harmless and indemnify Lessor against any and all liability or loss whatsoever resulting from the use, operation, handling, or transportation of the Equipment, including those arising from Lessor's negligence.[4]

Aside from these provisions, Bertling could not identify any written policy stating what BBER employees "should do when they see customers misusing equipment." He later agreed that, if he or his employees saw a customer using their equipment improperly, the customer "would be advised to not use it."

Bertling said BBER has done business with Seymour for about twelve years and with Roger for around fourteen. Though Seymour was the customer and paid for the

---

[4] The contract also states:

19. CUSTOMER OBLIGATION TO INDEMNIFY. For and in additional consideration of Lessor providing the Equipment herein, Customer will defend, indemnify and hold harmless Lessor and its officers, agents and employees, for and against all loss, liability, claim, action or expense, including reasonable attorney's fees, by reason of bodily injury, including death, and property damages, sustained by any person or persons, including but not limited to employees of Customer, as a result of the maintenance, use, possession, operation, erection, dismantling, servicing or transportation of the equipment, or Customer's failure to comply with the terms of this Agreement.

20. CUSTOMER'S COMPLIANCE WITH LAW. Customer will, at its expense, comply with all Federal, State and local laws and regulations affecting the Equipment and its use, operation, erection, design and transportation, including without limitations, licensing and building code requirements[,] and will defend, indemnify, and hold Lessor harmless from all loss, liability or expense resulting from actual or alleged violations of any such laws, regulations or requirements.

BBER has not sought indemnification from Seymour based on these provisions.

8

rentals, Bertling frequently communicated directly with Roger to arrange deliveries. Bertling explained that, in early 2020, the forklift Roger ordinarily used was being repaired, so BBER provided him with a different one. On January 15, Roger texted Bertling to ask about the status of the repairs; Roger noted that while the new forklift is "a Cadillac" compared to the old one, it has "bigger" forks and Roger would need to "redo [the] pockets" on his basket. Bertling told Roger that "[w]e should have yours like a Cadillac in the next week." Roger responded: "Sounds good[.] Just basket doesn't fit [so] I'll have to [expletive] rig it." Bertling replied: "We will try to hurry." Bertling denied that these texts constituted BBER's written consent for Roger to use the subject basket with the forklift. In any event, it is undisputed that Roger's usual forklift was eventually repaired, was delivered to Roger for use at the Nordheim jobsite, and was operating properly on July 24, 2020.

Bertling identified several photos of the subject forklift. He stated BBER has owned it for over ten years but that it has been "[o]ut of service" ever since the accident. He could not identify any photo depicting a "proper capacity chart displayed in the cab" as required by the operation and safety manual. He agreed that it was "possibl[e]" that he read the part of the manual concerning unapproved attachments, but he denied that he considered himself an "expert" on the equipment offered for rent by his company.

According to Bertling, BBER does not own any forklift attachments and has never offered any for rental, although other companies do offer them. Counsel presented Bertling with the following photo of Roger's man basket taken after the accident:

9



Bertling denied knowing what this was or what it was used for. He said he had never seen it until this litigation started. He acknowledged that there was no company name or placard on the basket, but he would not agree that the basket "looks to be homemade," noting that "I'm not a basket judger."

Bertling was presented with invoices from 2014, 2017, 2018, 2019, and 2020 showing that BBER delivered Roger's basket along with the forklift to and between Seymour's jobsites on numerous occasions. The 2018 invoice stated in part "please don't forget to take the basket with the lift." Bertling denied ever personally transporting Roger's forklift or basket. He agreed that, though Seymour was charged a fee for transportation of the forklift, there was no extra charge to move the basket as well. He further agreed that BBER has the "right to revoke or cease the rental of equipment if it has reason to believe that the equipment is being misused."

**C.     Dockery**

Dockery testified that he has owned Seymour since 2012 or 2013. Since his secretary quit in 2021, Seymour has had no employees; instead, it hires contractors to do general commercial construction work for its customers. Dockery said he does not require customers to sign a contract or pay up front, nor does it require its contractors to be licensed, bonded, or insured. According to Dockery, Roger's company had been doing work for Seymour since 2009, and Roger used the same man basket for eight or nine years. Dockery did not know where Roger got the basket or how it was built.

On July 24, 2020, Seymour was paying for the rented forklift. When asked whether it was common for Seymour to pay for Roger's equipment rentals, he said "only when credit issues were involved"; he later clarified this arrangement had been going on for around two years because Roger "could not pay for it." That day, Dockery was at a different jobsite when Roger called him to inform him that there had been an accident and that Francisco had died. The following day, Roger told him that the accident occurred because the basket "wasn't attached" to the forklift and "they didn't make sure it was attached."

**D.     Experts**

Bullen, a licensed professional engineer with over twenty-five years of experience, prepared a "Preliminary Report" based on the evidence he reviewed, and he gave opinions "within a reasonable degree of engineering probability." In his report, Bullen stated that "OSHA has established regulations for Powered Industrial Trucks in Standard 1910.178" and that "[t]his standard applies" to the forklift at issue. He also said there are other OSHA regulations which are "relevant" to that forklift, including Standard 1926.602

11

concerning "Material Handling Equipment," and that it is also "covered by ANSI/ITSDF[5] standard B56.6 – 2016 Safety Standard for Rough[] Terrain Forklift[] Trucks." According to Bullen, that standard provides in part that a "personnel work platform" must always "be securely attached to the forks" of the forklift, and "[o]nly trained and authorized persons shall be permitted to operate a rough terrain forklift truck."

Bullen opined that owners of equipment such as the JLG forklift have "a responsibility to ensure that it is safe for use prior to providing it to others" as well as "a responsibility to ensure that only certified, properly trained personnel are given authorization and access to operate the equipment." He further opined that BBER failed to comply with these responsibilities; "failed to adequately address the use of unauthorized attachments," thereby rendering the forklift "unreasonably dangerous and unsafe"; and failed to inform Roger that the equipment it provided to him "failed to comply with ANSI Standards, OSHA regulations, and the manufacturer's recommendations." According to Bullen, these failures "were contributing factual causes" to the accident.

Hinds testified he is an OSHA-certified forklift operator, has worked in the equipment rental industry for over twenty years, and owns a consulting firm "specializing in OSHA safety regulations and training." He prepared a report regarding applicable

---

[5] "The American National Standards Institute (ANSI) is a private, non-profit organization that administers and coordinates the U.S. voluntary standards and conformity assessment system." *ANSI Introduction*, https://www.ansi.org/about/introduction (last visited May 15, 2026).

The Industrial Truck Standards Development Foundation (ITSDF) was formed in 2005 to administer the B56 Standards Committee. The B56 Standards Committee's scope is the establishment of the safety requirements relating to the elements of design, operation, and maintenance, the standardization relating to principal dimensions to facilitate interchangeability, and establishment of test methods and test procedures, for powered and non-powered industrial trucks (not including vehicles intended primarily for earth-moving or over-the-road hauling) and wheels and casters.

*ITSDF: About Us*, https://www.itsdf.org/cue/about-us.html (last visited May 15, 2026).

standards of care "based on a reasonable degree of probability based on [his] education and industry experience, training, knowledge, and skill in the fields of equipment rentals, construction safety, and OSHA requirements and regulations."

Hinds's report stated: "Conducting a root cause analysis, I see the fatality occurring for two reasons: [(1) a]llowing an uncertified operator to rent and use the [f]orklift and [(]2) the misuse of the JLG forklift by using an unauthorized homemade platform." In addition to OSHA regulations and ANSI standards, Hinds noted that "there are specific industry standards within the equipment rental field for equipment dealers to follow to ensure a safe rental," including those promulgated by the American Rental Association. According to Hinds,

> the equipment dealer is considered to be the expert of the equipment and must act as gate keeper prior to the rental due to the known hazards that heavy machinery equipment pose[s] to the general public and workers if not operated in a safe manner. This means that a dealer must inquire about the use for the equipment, who will be using the equipment, and whether those persons have been properly trained and certified to use the equipment prior to the rental.

Hinds also cited a 2001 "OSHA Letter of Interpretation" providing that it is the employer's obligation to "ensure that this type of equipment is used to elevate personnel only where the manufacturer has designed it to do so."

Hinds noted that according to testimony, BBER employees moved Roger's "unauthorized platform on several occasions[] by attaching the platform to the forklift," and he opined that this "would have put [BBER] on notice that this platform did not meet" the applicable standards. He stated that Roger's basket

> lacked the proper safety restraints to lock the basket into place such as pins to lock in the forks into the basket pockets. The man basket was made of plywood and other scrap materials that should have been obvious to someone within the equipment dealer industry that it was homemade, and that its use with the forklift constituted a misuse of the forklift rental

13

equipment and posed a serious hazard to any person using the forklift. Hinds opined that BBER employees "should have noted and informed [Seymour], [Roger], and any other users of the forklift that the homemade work platform did not meet ANSI nor JLG standards." Hinds further stated that "BBER failed to have a policy or procedure in place to require that a lessor and user of its equipment was properly qualified and OSHA certified" and that, even if Roger was certified, BBER "knew or should have known that the man basket was an unauthorized attachment to the forklift and constituted a misuse of the forklift, proximately causing the fatality." He noted "[t]here were many opportunities along the way for [BBER] to have stopped the lease and educate [Roger]/[Seymour] on the need to become a certified forklift operator and to get a proper man-basket."

As to Seymour, Hinds opined that it had "overall responsibility for safety [at] the worksite as the controlling contractor" and "controlling employer" of Roger and Francisco, even though they were technically independent contractors. In Hinds's opinion, having rented the same equipment for at least eight years, Seymour "knew or should have known that [Roger]'s platform was . . . unauthorized [and] unsafe"; he further stated that Seymour "could have stopped the rental they were paying for," and "could have shut down the jobsite." He said "there is no such thing as properly using the wrong equipment, especially by an unqualified operator" and that Francisco's "death was entirely preventable for the above reasons."

### III. DISCUSSION

Hernandez enumerates three issues on appeal: (1) negligent entrustment of a forklift is a viable claim; (2) the trial court erred in dismissing his negligent entrustment claims; and (3) the trial court erred in dismissing his other negligence claims, specifically

14

those alleging appellees breached a duty to warn. Hernandez also argues by an unenumerated issue that the trial court erred in dismissing his gross negligence claims.

## A.    Applicable Law and Standard of Review

A movant for traditional summary judgment has the burden to establish that no genuine issue of a material fact exists and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(a)(1), (b)(3)(A). A movant for no-evidence summary judgment may claim, after adequate time for discovery, that there is no evidence of an essential element of a claim or defense on which the non-movant would have the burden of proof at trial. *Id.* R. 166a(a)(2), (b)(3)(B). Under either standard, if the non-movant produces more than a scintilla of evidence to raise a fact issue on the challenged elements, then summary judgment is improper. *Amedisys, Inc. v. Kingwood Home Health Care, LLC*, 437 S.W.3d 507, 511 (Tex. 2014); *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). "More than a scintilla of evidence exists when the evidence 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *King Ranch, Inc.*, 118 S.W.3d at 751 (quoting *Merrell Dow Pharms. Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). Less than a scintilla of evidence exists when the evidence is "so weak as to do no more than create a mere surmise or suspicion" of a fact. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004).

We review a trial court's summary judgment ruling de novo. *Scripps NP Operating, LLC v. Carter*, 573 S.W.3d 781, 790 (Tex. 2019). We view the evidence in the light most favorable to the non-movant, and we indulge every reasonable inference and resolve any doubts against the motion. *Buck v. Palmer*, 381 S.W.3d 525, 527 (Tex. 2012) (per curiam); *Smith v. O'Donnell*, 288 S.W.3d 417, 424 (Tex. 2009).

Texas Rule of Civil Procedure 166(g) provides that a court may hold a pre-trial hearing to identify "legal matters to be ruled on or decided by the court." TEX. R. CIV. P. 166(g). According to the Texas Supreme Court, this rule "authorizes trial courts to decide matters that, though ordinarily fact questions, have become questions of law because 'reasonable minds cannot differ on the outcome.'" *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018) (quoting *Walden v. Affiliated Comput. Servs., Inc.*, 97 S.W.3d 303, 322 (Tex. App.—Houston [14th Dist.] 2003, pet. denied)). "When a Rule 166(g) order disposes of claims in this fashion, the order is akin to a summary judgment or directed verdict, and review is de novo." *Id.*; *see Hamilton v. ConocoPhillips Co.*, No. 13-22-00096-CV, 2024 WL 484663, at *2 (Tex. App.—Corpus Christi–Edinburg Feb. 8, 2024, no pet.) (mem. op.).

## B. Negligent Entrustment

To establish either appellee's liability for negligent entrustment, Hernandez must prove: (1) appellee entrusted the forklift to Roger; (2) Roger was an incompetent or reckless forklift operator; (3) at the time of the entrustment, appellee knew or should have known that Roger was an incompetent or reckless operator; (4) Roger was negligent on the occasion in question; and (5) Roger's negligence proximately caused the accident. *See Campbell v. Hendershot Equip. Co.*, 717 S.W.3d 494, 512 (Tex. App.—Eastland 2025, pet. denied) (citing *4Front Engineered Sols., Inc. v. Rosales*, 505 S.W.3d 905, 909 (Tex. 2016)). A lack of formal training and certification does not establish an operator's incompetence or recklessness. *See 4Front*, 505 S.W.3d at 910–11. To show recklessness, there must be evidence that the actor engaged in an act he or she knew or should have known posed a high degree of risk or serious injury. *Id.* at 911 (first citing

16

*City of Amarillo v. Martin*, 971 S.W.2d 426, 430 (Tex. 1998) (defining recklessness); and then citing *Wal-Mart Stores, Inc. v. Alexander*, 868 S.W.2d 322, 326 (Tex. 1993) ("The usual meaning assigned to 'willful,' 'wanton,' or 'reckless,' according to taste as to the word used, is that the actor has intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences.")).

## 1. Cognizability

By his first issue on appeal, Hernandez argues that negligent entrustment of a forklift is a cognizable cause of action in Texas. We agree based on our precedent in *4Front*:

> [Appellant] argues that "[n]o Texas case establishes a cause of action for negligent entrustment of a forklift" and "Texas appellate courts have only expanded the doctrine in the case of firearms." *See Kennedy v. Baird*, 682 S.W.2d 377, 378–79 (Tex. App.—El Paso 1984, no writ).
>
> As [appellant] correctly notes, liability for negligent entrustment is most often alleged in suits arising out of motor vehicle accidents. *See Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 758 (Tex. 2007). A forklift is a motor vehicle. [Appellee] concedes that Texas courts have not addressed whether liability may arise from the negligent entrustment of an industrial vehicle such as a forklift; however, by the same token, [appellant] has directed us to no authority indicating that such liability should not or may not be extended beyond the context of personal-use vehicles or firearms. Instead, we believe the principles underlying negligent entrustment liability are squarely applicable to [appellee]'s claim. Negligent entrustment is founded on section 390 of the Restatement (Second) of Torts, which states:
>
>> One who supplies directly or through a third person a chattel for the use of another whom the supplier knows or has reason to know to be likely because of his youth, inexperience, or otherwise, to use it in a manner involving unreasonable risk of physical harm to himself and others whom the supplier should expect to share in or be endangered by its use, is subject to liability for physical harm resulting to them.

17

RESTATEMENT ([SECON]D) OF TORTS § 390 (1965); *see Mayes*, 236 S.W.3d at 758; *see also Donahue v. Polaris Indus., Inc.*, No. 02-11-00279-CV, 2012 WL 1034908, at *4 (Tex. App.—Fort Worth Mar. 29, 2012, pet. denied) (mem. op.) ("[T]here is no articulable distinction between section 390 and negligent entrustment." [internal quotation omitted]). "Chattel" is defined as "[m]ovable or transferable property; personal property; esp[ecially], a physical object capable of manual delivery and not the subject matter of real property." BLACK'S LAW DICTIONARY 268 (9th ed. 2009). A forklift fits within this definition. Moreover, in recognizing that liability may attach to the negligent entrustment of a firearm, the El Paso Court of Appeals observed:

> The establishment of the negligent entrustment of an automobile theory of recovery was developed by the courts because of the realization that one who entrusts an automobile to another owes a duty to the general public not to be negligent in such entrustment. An automobile when in the hands of one who is not competent to handle it becomes a threat to the general public, and the owner of the automobile who is negligent in the entrustment should be liable to the injured party provided that causation can be shown. The owner's liability does not arise out of a vicarious relationship, rather it arises out of the negligence of the owner in entrusting the automobile to another.

*Kennedy*, 682 S.W.2d at 378. The unanimous trial testimony established that a forklift, like a firearm, is also a machine which "when in the hands of one who is not competent to handle it becomes a threat to the general public." *Id.* We are aware of no reason to limit the applicability of negligent entrustment liability to the personal-use vehicle or firearm context. For the foregoing reasons, we reject [appellant]'s contention that the cause of action is not cognizable.

*4Front Engineered Sols., Inc. v. Rosales*, 512 S.W.3d 357, 376 (Tex. App.—Corpus Christi–Edinburg 2015), *rev'd on other grounds*, 505 S.W.3d 905. On petition for review, the Texas Supreme Court reversed our judgment, concluding that there was no evidence the forklift's operator was reckless or incompetent or that the appellant knew or should have known that he was reckless or incompetent. 505 S.W.3d at 910–11. The Court assumed, but did not decide, that "the negligent-entrustment theory applies to forklifts." *Id.* at 908. In doing so, it cited cases in which courts have applied negligent entrustment to "a variety of chattel," including "specifically to forklifts." *Id.* at 907 n.5 (collecting cases).

18

Appellees direct us to no controlling authority abrogating our holding in *4Front* that negligent entrustment of a forklift is a cognizable cause of action in Texas.[6] Accordingly, we follow that holding here. *See Mitschke v. Borromeo*, 645 S.W.3d 251, 256 (Tex. 2022) (noting that under "horizontal *stare decisis*," "three-judge panels must follow materially indistinguishable decisions of earlier panels of the same court unless a higher authority has superseded that prior decision"). To the extent the trial court's dismissal of the negligent entrustment claims was based on the general lack of cognizability of such claims in Texas, the court erred. Hernandez's first issue is sustained.

### 2.    Proximate Causation

By his second issue, Hernandez argues that the trial court erred by dismissing his negligent entrustment claims against both appellees. He asserts in particular that both appellees had actual knowledge that Roger was a reckless forklift operator because they knew he had been using the unauthorized man basket for many years. *See 4Front*, 505 S.W.3d at 909; *Campbell*, 717 S.W.3d at 512 (setting forth elements of negligent entrustment). In response, both appellees principally argue that their entrustment of the equipment to Roger, even if negligent, did not proximately cause the accident.[7]

---

[6] Seymour cites *Nelson v. H & E Equipment Services, Inc.*, in which the Fourteenth Court of Appeals inaccurately cited the Texas Supreme Court's *4Front* opinion for the proposition that "[n]egligent entrustment applies only to automobiles and similar vehicles, not to industrial equipment like a forklift." No. 14-21-00704-CV, 2023 WL 4503544, at *9 (Tex. App.—Houston [14th Dist.] July 13, 2023, no pet.) (mem. op.) (proceeding to analyze the merits of appellant's claim for negligent entrustment of a front loader anyway). We do not follow *Nelson* because it (1) conflicts with our holding in *4Front*, and (2) misrepresents the Texas Supreme Court's opinion on petition for review in that case.

[7] At the outset, BBER argues that Hernandez's negligent entrustment claim must be rejected because he failed to address causation in his response to its Rule 166(g) motion. We disagree. As noted, BBER's Rule 166(g) motion argued specifically only that "*any alleged lack of warning* was not the proximate cause of the incident at issue or [Hernandez]'s claimed damages" (emphasis added). On the other hand, in its section regarding the negligent entrustment claim, BBER's motion did not contest the causation element. In any event, although Hernandez did not explicitly address the causation element in his response, he extensively argued the issue of foreseeability—which is relevant to both the existence of a duty and

19

"Breach of a duty proximately causes an injury if the breach is a cause in fact of the harm and the injury was foreseeable." *Stanfield v. Neubaum*, 494 S.W.3d 90, 97 (Tex. 2016) (citing *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Rsch. Corp.*, 299 S.W.3d 106, 122 (Tex. 2009)). "Cause in fact requires 'proof that (1) the negligent act or omission was a substantial factor in bringing about the harm at issue, and (2) absent the negligent act or omission ("but for" the act or omission), the harm would not have occurred.'" *Id.* (quoting *Akin*, 299 S.W.3d at 122). A plaintiff proves foreseeability of the injury by establishing that "a person of ordinary intelligence should have anticipated the danger created by a negligent act or omission." *Id.* (quoting *Doe v. Boys Clubs of Greater Dall., Inc.*, 907 S.W.2d 472, 478 (Tex. 1995)). "Conjecture, guess, and speculation are insufficient to prove cause in fact and foreseeability." *Id.* (citing *Akin*, 299 S.W.3d at 122). "For entrustment to be a proximate cause, the defendant entrustor should be shown to be reasonably able to anticipate that an injury would result as a natural and probable consequence of the entrustment." *Schneider v. Esperanza Transmission Co.*, 744 S.W.2d 595, 596 (Tex. 1987).

BBER argues that, although Hernandez alleged it "encouraged and facilitated Roger's use of the basket in exactly the manner which led to Hernandez's injury," it did not "'encourage[]' or 'facilitate[]' [Roger]'s failure to perform safety checks or failure to slot the tines of the JLG telehandler into the custom man basket." Similarly, Seymour argues that "[u]se of a conforming man basket approved by the manufacturer without ensuring it

---

proximate causation—and he attached evidence relevant to the issue.

Further, BBER points to no authority stating a trial court's ruling on a Rule 166(g) motion is restricted "to issues raised in the motion, response, and any subsequent replies," as a ruling on a summary judgment motion would have been. *See Rojas v. CitiMortgage, Inc.*, No. 13-16-00257-CV, 2017 WL 4054397, at *4 (Tex. App.—Corpus Christi–Edinburg Sep. 14, 2017, no pet.) (mem. op.) (describing former Rule 166a(c)).

was properly attached to the forklift would have resulted in the same accident." In other words, both appellees argue that Roger's failure to ensure the forklift's prongs were inserted into the basket's pockets on the day of the accident was an intervening or superseding cause of the accident, thereby extinguishing the causative effect of their negligence, if any.

The Texas Supreme Court has explained:

Although there can be more than one proximate cause of an injury, *see Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992), a new and independent, or superseding, cause may "intervene[] between the original wrong and the final injury such that the injury is attributed to the new cause rather than the first and more remote cause[.]" *Dew v. Crown Derrick Erectors, Inc.*, 208 S.W.3d 448, 450 (Tex. 2006) (plurality op.). A new and independent cause thus destroys any causal connection between the defendant's negligence and the plaintiff's harm, precluding the plaintiff from establishing the defendant's negligence as a proximate cause. *See Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 856 (Tex. 2009) (explaining how a new and independent cause "destroys the causal connection, if any, between the act or omission inquired about and the occurrence in question"); *Dew*, 208 S.W.3d at 450 (same). In contrast, a concurring cause "concurs with the continuing and co-operating original negligence in working the injury," leaving the causal connection between the defendant's negligence and the plaintiff's harm intact. *See Gulf, C. & S.F. Ry. Co. v. Ballew*, 66 S.W.2d 659, 661 (Tex. Comm'n App. 1933, holding approved). . . .

In assessing whether an intervening cause disrupted the causal connection between the defendant's negligence and the plaintiff's harm and constitutes a new and independent cause, we consider a variety of factors, including foreseeability. If the intervening cause and its probable consequences are a *reasonably* foreseeable result of the defendant's negligence, the intervening cause "is a concurring cause as opposed to a superseding or new and independent cause." *Hawley*, 284 S.W.3d at 857. But if "nothing short of prophetic ken could have anticipated the happening of the combination of events" by which the original negligence led to an intervening force that resulted in the plaintiff's injury, the harm is not reasonably foreseeable. *See* [*Tex. & P. Ry. Co. v.*] *Bigham*, 38 S.W. [162,] 164 [(Tex. 1896)]. Foreseeability is a highly fact-specific inquiry that must be determined "in the light of the attending circumstances," not in the abstract. *See id.* (quoting [*Milwaukee & St. Paul Ry. Co. v.*] *Kellogg*, 94 U.S. [469,] 475 [(1876)]).

*Stanfield*, 494 S.W.3d at 97–99 (footnotes omitted). The existence of a superseding or intervening cause "is not an affirmative defense; rather, 'it is but an element to be considered by the jury in determining the existence or non-existence of proximate cause.'" *Id.* at 97 n.6 (quoting *Dall. Ry. & Terminal Co. v. Bailey*, 250 S.W.2d 379, 383 (Tex. 1952)).

Having reviewed the record, we conclude there is more than a scintilla of evidence to support a finding that Roger was reckless, that appellees knew or should have known Roger was reckless at the time of entrustment, and that their entrustment of equipment to Roger was a proximate cause of the accident. First, a jury could reasonably conclude that Roger himself was reckless by using a crude, ramshackle device he obtained for free at a previous worksite to perform a function which was critical to the lives of his employees. *See Campbell*, 717 S.W.3d at 512 (setting forth negligent entrustment elements). As Hinds stated, the basket was "made of plywood and other scrap materials" and "lacked property safety restraints," and due to its appearance, it "should have been obvious to someone within the equipment dealer industry that it was homemade." Whether or not the basket at issue was truly "homemade," its use in conjunction with the forklift violated the repeated, urgent requirements and warnings stated in the operation and safety manual. According to Bullen, its use also violated applicable ANSI standards and OSHA regulations. Based on this evidence, a jury could conclude that Roger—an experienced forklift operator—knew or should have known that using this basket in conjunction with any forklift "posed a high degree of risk of serious injury" to him or others. *See 4Front*, 505 S.W.3d at 911; *Martin*, 971 S.W.2d at 430 (defining recklessness).[8]

---

[8] BBER argues that "[Roger]'s repeated use of the man-basket cannot be recklessness because

22

BBER argues that the record "conclusively establishes" Roger was not reckless because he "used custom man-baskets many times," he opined that there was "no difference between a custom man-basket and commercially available man-baskets," and he "never had a basket fall from a forklift" in his decades-long career. However, as Hernandez argues, merely because Roger and his employees used the "scrap" basket for many years without a serious incident does not mean that the practice was not reckless. By definition, a person acting recklessly does not guarantee a negative outcome every time he acts but rather gambles that such an outcome does not come to pass, despite the apparent risk. *See 4Front*, 505 S.W.3d at 911; *Martin*, 971 S.W.2d at 430. A jury must sort through all of this evidence and make a determination as to its credibility, something we are not permitted to do at this stage of the proceedings.

There is also enough evidence for a jury to reasonably determine that appellees knew or should have known of Roger's recklessness.[9] Here, BBER rented the same forklift to Roger for almost a decade and accepted his and Seymour's payments for the equipment, but it never inquired whether Roger was certified to use the forklift. Though the lack of certification does not alone establish an operator's recklessness, *see 4Front*,

---

"as [a]ppellants readily admit, he did not appreciate the risk, if any, attendant to utilizing non-OEM equipment." It notes that Hernandez concedes in his brief that Roger "failed to appreciate the risk" on the day of the accident. However, in the very same sentence of his brief, Hernandez reiterated his allegation that Roger was "reckless" that day—and recklessness does not necessarily require *actual* knowledge or awareness of the risk. *See City of Amarillo v. Martin*, 971 S.W.2d 426, 430 (Tex. 1998) (defining recklessness as "an act that the operator knew *or should have known* posed a high degree of risk of serious injury" (emphasis added); *Wal-Mart Stores, Inc. v. Alexander*, 868 S.W.2d 322, 326 (Tex. 1993) (noting that the usual meaning of "willful," "wanton," or "reckless," is that "the actor has intentionally done an act of an unreasonable character in disregard of a known *or obvious* risk that was so great as to make it highly probable that harm would follow" (emphasis added)).

[9] BBER argues that Roger was not incompetent or reckless by using the homemade basket, but neither appellee disputes that, if that action is considered reckless, they were aware or should have been aware of that recklessness. *See Campbell v. Hendershot Equip. Co.*, 717 S.W.3d 494, 512 (Tex. App.—Eastland 2025, pet. denied) (setting forth negligent entrustment elements). We address the issue out of an abundance of caution and in our sole discretion.

23

505 S.W.3d at 910–11, both experts testified that this omission violated BBER's duty as a dealer of industrial equipment. Neither appellee challenged the experts' qualifications to opine on these issues, and a jury is better suited to decide whether and how to weigh their opinions.

Further, BBER regularly delivered both the forklift and the basket to and between Seymour's jobsites, often in direct communication with Roger, and it therefore knew or should have known that the basket was being used with the forklift. For its part, Seymour paid BBER specifically for the delivery of both the forklift and the basket, and Hinds testified that under applicable OSHA regulations, it was the "controlling employer" at the Nordheim site and was therefore responsible for ensuring that only manufacturer-approved forklift attachments are used. Finally, as demonstrated by photographs and consistent with Hinds's testimony, the material composition and appearance of the basket put both appellees on alert that Roger was risking his employees' lives by using it. *4Front* is distinguishable on this basis. *See 4Front*, 505 S.W.3d at 911 (noting there was "no evidence that [the operator] was incompetent or reckless" prior to the accident at issue). Ultimately, these are issues for a jury to resolve.

In their causation argument, appellees contend that, even if they knew or should have known Roger was a reckless forklift operator by virtue of his using an unauthorized and unsafe man basket, they could not have specifically foreseen that he would fail to attach the basket properly on the day of the accident. Based on the evidence, a jury could reasonably disagree. It is arguably foreseeable that an uncertified and habitually reckless forklift operator would fail to properly attach a man basket to a forklift before beginning a job. Moreover, Hernandez correctly notes that to create a fact question on causation, he

24

"does not have to establish that the exact event—failure to insert the tines—was foreseeable." Rather, "[f]oreseeability requires only that the general danger, not the exact sequence of events that produced the harm, be foreseeable." *Walker v. Harris*, 924 S.W.2d 375, 377 (Tex. 1996) (citing *Lofton v. Tex. Brine Corp.*, 777 S.W.2d 384, 387 (Tex. 1989)); *see City of Waco v. Kirwan*, 298 S.W.3d 618, 624 (Tex. 2009).

Here, based on Roger's habitual use of what was described as a crudely-assembled man basket to lift employees to potentially fatal heights, contrary to manuals and regulations, a reasonable person of ordinary intelligence could have anticipated the general danger—i.e., that a serious accident would occur on a jobsite directly involving Roger's operation of a forklift.[10] There is more than a scintilla of evidence in the record to support the submission of Hernandez's negligent entrustment claims to a jury. Hernandez's second issue is sustained.[11]

## C.     Duty to Warn

By his third issue on appeal, Hernandez argues that the trial court erred by dismissing his other negligence claims, including specifically his claims that both appellees owed a duty to warn about "the danger of using an unapproved attachment."

"As a general rule, one who employs an independent contractor has no duty to ensure that the contractor safely performs its work." *JLB Builders, L.L.C. v. Hernandez*,

---

[10] The actions which may support a finding that Roger was reckless at the time of entrustment (his use of an unauthorized basket) were not the same as the actions which may support a finding that Roger was negligent at the time of the injury (his failure to properly attach the basket). But appellees cite no authority, and we find none, indicating that such strict equivalence is necessary to support a negligent entrustment action. *See Campbell*, 717 S.W.3d at 512 (setting forth negligent entrustment elements).

[11] Seymour additionally argues, without reference to authority, that because it did not own the forklift, it can be held liable for negligent entrustment only if it had "the right to control the vehicle." Seymour does not explain how this bears upon any of the essential elements of negligent entrustment. *See id.*; *see also* TEX. R. APP. P. 38.1(i).

622 S.W.3d 860, 864–65 (Tex. 2021). "However, an exception to this rule arises when 'the employer retains some control over the manner in which the contractor performs the work that causes the damage.'" *Id.* at 865 (quoting *AEP Tex. Cent. Co. v. Arredondo*, 612 S.W.3d 289, 295 (Tex. 2020)); *see Redinger v. Living, Inc.*, 689 S.W.2d 415, 418 (Tex. 1985) ("One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care."). "A plaintiff can prove the requisite control by establishing that the general contractor either actually controlled the manner in which the subcontractor performed its work or had a contractual right to do so." *JLB Builders*, 622 S.W.3d at 865. Either way, the control retained or exercised by the general contractor "must be more than a general right to order the work to start or stop, to inspect progress or receive reports." *Redinger*, 689 S.W.2d at 418. It must "extend to the means, methods, or details of the independent contractor's work." *JLB Builders*, 622 S.W.3d at 865 (citation modified); *see Koch Ref. Co. v. Chapa*, 11 S.W.3d 153, 156 (Tex. 1999) (noting that a general contractor "must have some latitude to tell its independent contractors what to do, in general terms, . . . without becoming subject to liability").

Here, BBER had the right to stop renting equipment to Roger, and Seymour had the right to stop his work, but there is no evidence that either appellee had the right to control or actually did control the manner in which Roger performed his work. In arguing that a fact question was created on this issue, Hernandez does not suggest that either appellee had the contractual right to control Roger's work. Instead, he points to Bertling's text to Roger stating he would "try to hurry" to get Roger's usual forklift back, as well as

26

the ample evidence showing that Seymour requested and paid for the basket to be transported to and between its jobsites. More broadly, Hernandez cites *EDCO Production, Inc. v. Hernandez*, 794 S.W.2d 69 (Tex. App.—San Antonio 1990, writ denied), for the proposition that "[c]ontrol is not the ultimate issue in a negligence case, foreseeability is." In that case, an employee of an independent contractor hired by the appellant was seriously injured while "attempting to weld a ring or hoop on a ladder attached" to an oil storage tank under the appellant's control. *Id.* at 70. The jury found, in part, that the appellant's employee "negligently led [the worker] to believe that it was safe to weld while on the tank." *Id.* at 74. The San Antonio Court held that the appellant's "liability does not rest on its right to control the activities of" the injured worker, noting that the claim "relates to an act of negligence by [appellant] itself—an act entirely unrelated to [the appellant]'s right to control [the worker]." *Id.* at 74, 76.

*EDCO* is distinguishable because the appellant in that case made a negligent misrepresentation of fact to induce the plaintiff to undertake an unsafe activity. *See id.* at 76. There are no such allegations or evidence in this case. In any event, though Hernandez asks us to focus on foreseeability of the risk rather than control, he acknowledges in his brief that "[i]t is only . . . where some nexus and *some control* exists, that the owner or contractor can actually foresee that its actions could lead to the plaintiff's injuries" (emphasis added). We conclude that, according to the record, neither appellee controlled the manner in which Roger performed his work. *See JLB Builders*, 622 S.W.3d at 865; *Redinger*, 689 S.W.2d at 418. Therefore, the trial court did not err in dismissing Hernandez's other negligence claims as a matter of law.

We overrule Hernandez's third issue.

**D.     Gross Negligence**

Finally, Hernandez contends the trial court erred in dismissing his claims against both appellees for gross negligence. "Gross negligence" means an act or omission:

> (A)     which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and
>
> (B)     of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

TEX. CIV. PRAC. & REM. CODE § 41.001(11); *see R & R Contractors v. Torres*, 88 S.W.3d 685, 707–08 (Tex. App.—Corpus Christi–Edinburg 2002, no pet.). As to the first requirement, "extreme risk" means the likelihood of serious injury to the plaintiff. *R & R Contractors*, 88 S.W.3d at 708. As to the second requirement, "ordinary negligence rises to the level of gross negligence when it can be shown that the defendant was aware of the danger but his acts or omissions demonstrated that he did not care to address it." *Id.*

In arguing the evidence created a fact issue on gross negligence, Hernandez points to largely the same testimony as discussed in his other issues. He argues that both Bertling and Dockery "both knew that [Roger] had established a pattern of recklessly using the forklift and basket" and "would be using it the same way on this job," and that they "not only acquiesced in that dangerous use, but each actually took an active part in ensuring that the basket would be on this jobsite."

In responding to this issue on appeal, both appellees argue merely that Hernandez's gross negligence claims fail because his ordinary negligence claims fail, and they reiterate their arguments as to the latter claims. In particular, BBER contends that Hernandez failed to address proximate causation, and Seymour contends that "there was no negligence." We have already rejected those arguments in the context of Hernandez's

28

first issue. As Hernandez notes, a plaintiff may obtain punitive damages by establishing gross negligence in the context of a negligent entrustment claim. *See Schneider*, 744 S.W.2d at 596 ("Punitive damages can be imposed if the owner of the vehicle knows or should have known that the entrusted driver was incompetent or habitually reckless and the owner was grossly negligent in entrusting the vehicle to that driver."); *see also* TEX. CIV. PRAC. & REM. CODE § 41.003(a)(3).

Under these circumstances, where appellees offer no substantive argument for why the evidence did not support a finding of grossly negligent entrustment, we conclude that judgment as a matter of law was improper. Hernandez's unenumerated fourth issue is sustained.

## IV. CONCLUSION

We reverse that part of the trial court's judgment dismissing Hernandez's claims for negligent entrustment and grossly negligent entrustment, affirm the remainder of the judgment, and remand for further proceedings consistent with this memorandum opinion.

YSMAEL D. FONSECA
Justice

Delivered and filed on the
21st day of May, 2026.

29